MILLER *v.* STATE.

*(Nashville,* December Term, 1952.)

Opinion filed February 6, 1953.

HARRY P. RUBERT, of Memphis, for plaintiff in error.

KNOX BIGHAM, Assistant Attorney General, for the State.

MR. JUSTICE BURNETT delivered the opinion of the Court.

Miller was indicted and convicted for removing mortgaged property beyond the limits of the State without the consent of the mortgagee. His punishment was fixed by the jury at a 60 day workhouse sentence.

Miller, plaintiff in error, worked for the Kimberly-Clark Company in Memphis. This company for the benefit of its employees operated a credit union. Miller went to work for the company in June, 1951, and became a member of the credit union in July, of that year. On August 9, 1951, he obtained a loan of $483 from the credit union and to secure the payment of this loan he executed his note and a chattel mortgage Deed of Trust on his automobile. The Deed of Trust was filed for registration on September 12, 1951, and recorded on the following day in the Register's Office of Shelby County. A short while after receiving this loan the plaintiff in error left on a two week vacation and never returned to work for his employer, Kimberly-Clark. At the time Miller left his employment he had not paid the loan and made no payments to the credit union after leaving. He did have a very slight balance of a few dollars probably due to his credit in this union. The credit union had no further knowledge of him until it learned later in the Fall of that year that Miller was working for the Dupont Company in Augusta, Georgia. The evidence shows that no one gave Miller permission to remove the property from the State upon which the credit union had a Deed of Trust.

Nothing having been heard of Miller after he left, the credit union of course began to inquire about his whereabouts and sometime in October of that year the Dupont people in Georgia wrote Kimberly-Clark Company that Miller was working there and asked for some recommendation or something of the kind and it was through this that the credit union learned of his whereabouts. As

a result of learning where he was and the fact that he had left the State and had not paid or was not paying on this mortgage the credit union took out a warrant for Miller. About the middle of November, 1951, he was arrested in Augusta, Georgia. After an extradition hearing there he was returned to Memphis. One of the officers who went from Memphis to Augusta for Miller testifies that Miller had an apartment in Augusta and was living there with his wife.

The State in addition to the above proved that on August 15, 1951, or a few days after he had secured the loan from the credit union that he also obtained a loan of $300 from a private loan company in Memphis and secured this loan likewise by a Trust Deed on the same automobile that the credit union's loan was on. An officer of this independent company likewise testifies that Miller had received no permission from his concern to take the mortgaged property out of the State.

Miller gave the officers a statement when he was brought back to Memphis which substantially corresponds with the evidence that he gave in his behalf on the trial of this case. He testified that he had been a resident of Memphis since 1939 and considered Memphis his home. He went to some detail to show that Memphis was still considered his home; that he had kept a phone listed in his name in the phone book; that his wife remained there some weeks after he had gone to Augusta and only came to Augusta to join him some six or eight weeks prior to his arrest; that he had made efforts on a return trip shortly after he first left Memphis to contact the credit union and his former employer to tell them he had gone to Augusta and to try to make arrangements for a different method of paying for his automobile. He also says that after he was in Augusta he sent to his brother-in-law

by general delivery in Memphis two twenty dollar bills, thirty-six dollars of which was to be paid to this credit union on his automobile.

The first two assignments raise the question that the Trust Deed and note which it secured are void for usury. According to the note which is exhibited in the record the interest on the unpaid balance of the indebtedness was to be 1% per month. The officer of the credit union testifies that this 1% as shown on the note included all charges of making the loan and the interest. This being true the note was not usurious because under Code Section 3851 as amended by Chapter 192 of the Public Acts of 1951 credit unions are authorized to collect a total of interest and all other charges not in excess of 1% per month on the unpaid balance.

The third, fourth and sixth assignments insist that the evidence preponderates in favor of Miller's contention that the removal of the mortgaged property beyond the limits of the State was casual or temporary. In support of this insistence, as heretofore said, Miller testified to facts which support this contention. He said that his domicile continued to be in Memphis and that he was only working temporarily in Augusta. He also said that he had kept a phone number in the phone book for his house there and that his family lived in West Tennessee and that he had no intention to leave there. It seems to us that the Act under which the indictment is laid when properly construed does not authorize the removal of mortgaged property from this State for any appreciable period of time even though the mortgagor might continue to maintain his legal residence in Tennessee. The question under the Act is, what actually happens to the property, and not the status of the remover, that is controlling. It is perfectly possible that a man might leave his home and be gone for years but still maintain his domicile in his

former place of abode. As we all know this is a question of intention. The Statute here involved is designed for the protection of the mortgagee. If the property is removed beyond the limits of the State and there kept for an indefinite period of time it then becomes difficult, if not impossible, for the mortgagee to go against his security. If the mortgagor takes a brief trip beyond the limits of the State in or having this mortgaged property with him but returning at the conclusion of the visit of a week or two then the mortgagee's remedy against his security is not impaired.

█ The evidence in this case shows that the removal was not casual or temporary. In reading this record we are impressed with the fact that the removal of this automobile was permanent rather than temporary or casual. Miller had taken employment in another State and had been there about two months before he was arrested. His wife had joined him and they occupied an apartment. As a further indication that his employment was not merely transitory or temporary Miller testified that the week before the trial he was working at the Dupont plant in Jackson, South Carolina. The case was tried on March 4, 1952. The plaintiff in error was working for the Dupont Company outside of Tennessee from early September (12), 1951, until the time of trial, except for the times that he testifies that he had come to Memphis in connection with this case. This is a period of about five months and it seems reasonable to us that the plaintiff in error certainly would have kept this automobile with him during this entire time had he not turned it over to the officers after his arrest in November.

█ The fifth assignment is addressed to the admission of the testimony of the other loan company who made the second mortgage on this automobile. It seems to us that

this evidence was admissible for the purpose of showing intent. *Thompson* v. *State,* 171 Tenn. 156, 101 S. W. (2d) 467, 473. In that case this Court quoted from Wharton's Criminal Evidence, Vol. 1, pages 527-530 as follows:

"Sec. 352. To show plan, scheme, or system. Evidence of other crimes may be admitted when it tends to establish a common scheme or plan embracing the commission of a series of crimes so related to each other that proof of one tends to prove the other, and to show the defendant's guilt of the crime charged. Subsequent as well as prior collateral offenses can be put in evidence, and from such system, identity or intent can often be shown. The question is one of induction, and the larger the number of consistent facts, the more complete the induction is. The time of the collateral facts is immaterial, provided they are close enough together to indicate that they are a part of the system. A man may be honestly mistaken and have no fraudulent intent if a transaction stands alone, but the probabilities of an honest mistake diminish as the number of similar transactions, indicating a scheme or system, increases. * *"

Here we have within a week after the mortgage under which this indictment is laid the plaintiff in error mortgaging the same property to another party and then within the week leaving the State and making no payments on either mortgage.

Ordinarily under the statute involved in this case the question of intent to defraud is immaterial because the statute does not make such intent a necessary element of the offense. But in the instant case if intent to defraud can be shown then any testimony by the plaintiff in error to the effect that the removal was only casual and temporary is weakened to a great extent. It seems to us then

that clearly this testimony in reference to the other mortgage under these circumstances was admissible and does not constitute error because it to our minds shows an intent to not just leave the State for a brief trip but to stay away and defraud this creditor.

It seems very singular to us in discussing the fact questions that are raised with the assignments that this removal to another State was merely temporary or casual that the plaintiff in error during the weeks that he was away did not write to his former employer or the credit union or to someone in reference to where he was and make some payment or something of the kind to them. On cross-examination by the assistant district attorney general he was asked why he had not written and his answers generally were that he did not know their address or was afraid that they would not get the letter, or did not know who to write to, etc. He does say though that he wrote to a brother-in-law in Memphis in care of general delivery and enclosed in this letter two twenty-dollar bills and this brother-in-law taking the stand on behalf of the plaintiff in error testifies that he received these two twenty dollar bills in this way and paid a four dollar telephone bill out of the forty dollars and took the other thirty-six dollars for his own use. These facts in themselves clearly would support the verdict of the jury that this was not a temporary or casual leave of the State but was leaving the State contrary to the terms of the Act under which the indictment is laid.

The last insistence is that the Deed of Trust here involved is not within the terms of the Statute because it was not recorded at the time the mortgaged property was taken out of the State. The applicable section of Chapter 243 of the Public Acts of 1951 (under which the indictment is laid) reads as follows:

"Section 1. Be it enacted by the General Assembly of the State of Tennessee, That no maker of any registered mortgage or deed of trust upon personalty shall remove beyond the limits of this State any property embraced in and covered by said mortgage or deed of trust without the written consent of the holder of the indebtedness secured by deed of trust, provided, however, that this Act shall not apply to a casual or temporary removal of such property beyond the limits of the State".

It seems to us that this Statute requires the filing or registration of the instrument prior to the removal in order for the offense to be committed. This Act as heretofore said is for the protection of the mortgagee. It is of course perfectly obvious and conceivable to us all that a borrower might enter a loan company late in the afternoon and make a mortgage, execute the instrument, while it would be impossible for the lender to record this instrument until the following day yet the borrower might leave the State that night. Such a situation being possible it becomes necessary for the mortgagee to at least file the mortgage for registration before the mortgagor becomes criminally liable under this Statute.

It is a rule of criminal law that statutes which restrain liberty must be construed cautiously and strictly. *McCreary* v. *First National Bank,* 109 Tenn. 128, 7 S. W. 821. "In construing such statutes, however, we are to look for their reasonable sense, and if this is clearly ascertained it must be applied, though a narrower sense is possible." Wharton's Criminal Law, Vol. 1, Sec. 40, page 55.

The Statute herein creates the offense for the "maker of any *registered* mortgage" (emphasis ours) to take out of the State the automobile so mortgaged.

The mortgage in this case was not registered at the time the car was taken from the State. This being true there is no violation of the Statute and therefore the conviction cannot stand. For this reason the trial court must be reversed.