James **HARRELL** and Kenneth
McKelvey, Appellants,

v.

**STATE of Tennessee, Appellee.**

Court of Criminal Appeals of Tennessee,
At Knoxville.

Oct. 2, 1979.

Permission to Appeal Denied by Supreme
Court Jan. 28, 1980.

Ralph E. Harwell, Knoxville, for Harrell, appellant.

W. P. Boone Dougherty, Knoxville, K. David Myers, J. Howard Collette, Maynardville, for McKelvey, appellant.

William M. Leech, Jr., Atty. Gen., William P. Sizer, II, Asst. Atty. Gen., Nashville, Al Schmutzer, Jr., Dist. Atty. Gen., Richard R. Vance, Raymond Shirley, Asst. Dist. Attys., Sevierville, for appellee.

## OPINION

TATUM, Judge.

The appellants, James Harrell and Kenneth McKelvey, were each sentenced to a term of 15 years in the state penitentiary after their conviction for armed robbery. In separate briefs, they assign error relating to the trial judge's instructions to the jury, the admission of evidence of another armed robbery allegedly committed by the appellants, and the refusal of the trial judge to quash the indictment. Harrell also attacks the weight and sufficiency of the evidence. We find no reversible error.

The accredited evidence established that the two appellants arrived at Luttrell Supermarket in Union County at about 3:00 o'clock P.M. on 13 July 1978 in a distinctive 1977 Camaro automobile owned and driven by Harrell. Harrell backed the Camaro to the building with its front facing the street.

McKelvey went into the store and asked the cashier, Mrs. Imogene Dukes, for a package of cigarettes; he then pointed a pistol at her and demanded all of the money. Mrs. Dukes placed paper currency, rolled coins and loose change totaling $1,802.19 in a paper bag and gave it to McKelvey. She observed Harrell standing inside the store at the front door, detaining the store's bag boy, who was about to enter the store. As Mrs. Dukes approached the front door, McKelvey ordered her to "Get back in there." The two appellants left the store together. Mrs. Dukes made a positive line-up and in-court identification of the two appellants.

Acting on a radio dispatch, Deputy Sheriff Wayne Lee of Claiborne County set up a roadblock on Highway 131 by parking his unmarked detective car across the northbound lane and turning on the flashing blue light. He saw the red 1977 Camaro coming toward him with a marked Grainger County Police car, its siren sounding and blue light flashing, less than one-fourth mile behind in pursuit. The red Camaro was traveling at a high rate of speed and when Deputy Lee observed that it was not going to stop, he fired twice at the front tires with a 12 gauge shotgun; after the Camaro had passed, he fired the shotgun at the rear of the car. Deputy Lee followed the Camaro and soon found it in a ditch on the left side of the road; it was unoccupied with both doors standing open and the motor smoking. The wind was blowing $10 bills across the road from the Camaro and there was a pile of rolled coins about ten feet behind the Camaro. A quantity of .22 caliber bullets were on the passenger side of the front seat of the Camaro and .25 caliber bullets were between the seats.

The appellants walked to a nearby barn where Joe Green and a neighbor were working on an automobile. They first asked to use the telephone, but when they were told that there was no telephone, they asked to employ Joe Green and his companion to drive them to Tazewell. Joe Green had heard about the nearby robbery and the pursuit of the robbers in the area and he observed the handle of a pistol protruding from Harrell's pocket. Since he was afraid of the appellants, Green told them that his car would not run; however, he did give them the keys to his wife's green 1970 Ford Galaxy. He told the appellants that he trusted them and he asked them to leave the car at any service station in Tazewell. Harrell gave Green a $20 bill and the appellants drove the Ford away.

Hancock County Deputy Sheriff Lester Hyatt and Sheriff Seals were working on this case in Mr. Green's neighborhood when Green came running toward the officers, yelling that his car had been "stolen." The officers drove in the direction indicated by Green and came upon the green Ford parked in the road; McKelvey was outside the Ford talking with two ladies in a red car. McKelvey drew a small caliber pistol and Deputy Hyatt fired a warning shot over the car. McKelvey leaped in the passenger's side of the Ford and Harrell drove off at a high rate of speed. The uniformed officers returned to the marked police car and pursued the Ford, following it at close range and shooting at the rear tires. The green Ford went out of control and crossed the road; the officers covered the appellants with firearms and they submitted to arrest.

Harrell had exactly $506 in denominations of $20, $10, and $1 bills on his person. Approximately $350 of this amount was jammed in his front pockets; the remaining $100 to $150 was in his wallet. McKelvey had the total sum of $953 crammed into both of his front pockets. While Hyatt was searching Harrell, he told him that "his piece" was in his back pocket,[1] but Hyatt found no weapon on Harrell. A .25 caliber pistol, fully loaded, was lying on the driver's seat of Mr. Green's Ford where Harrell had been sitting. Also, a fully loaded .22 caliber revolver was lying in the floor board of the Ford on the passenger's side in plain sight of the officers.

The appellant, McKelvey, testified that $153 had been paid to him for painting a house occupied by Beth Holt, Tammy Holt, and Susan Loftis. On the night of 12 July 1978, he went to their house and found his friend, Harrell, in the red Camaro. The three young women and the appellants went to a party near Norris Dam where McKelvey sold two pounds of marijuana to Garry Butner for $800. Later that night, after consuming "many bottles of beer and drugs" including valiums, McKelvey returned to this same house. McKelvey stayed there overnight; Harrell came by the house in his red Camaro about 9:00 o'clock A.M. on 13 July 1978. During the morning, McKelvey, drinking beer and eating valiums, rode around with Harrell in the red Camaro.

McKelvey also testified that he did not remember entering Luttrell's Supermarket. He remembered that as he was riding down

1. In this context, the word "piece" is used as slang, meaning a weapon.

the road with Harrell driving, they saw an unmarked car with two men, armed with revolvers, standing outside. When Harrell stopped the car and asked the men "What's happening," McKelvey thought of the bag of marijuana, quantity of valiums and cooler of beer in the car. Thinking that the two men were narcotics officers, he told Harrell to "bust it;" Harrell started down the highway when the men started shooting at them. The police wrecked the car by shooting out the tires; the appellants got out of the car and ran across a couple of mountains to Mr. Green's barn.

McKelvey further testified that after borrowing Mr. Green's automobile, he and Harrell observed the two women in the parked automobile and stopped to ask directions. McKelvey was standing outside the car when two men in a marked police cruiser pulled behind them and began shooting at them. He jumped into the passenger's side of the Green Ford and they drove off with Harrell driving; the pursuing police shot McKelvey in the arm.

McKelvey denied having any knowledge of a pistol being in either the red Camaro or the green Ford.[2] He denied either having a pistol, seeing a pistol, or using a pistol in a robbery on the day before this incident.

The appellant Harrell testified that after McKelvey joined him on the day of the robbery, they obtained beer. Harrell decided to show McKelvey where he had formerly lived, and as he was driving McKelvey there, they stopped at Luttrell's Supermarket to get a beer from the trunk of the car. He got a beer and McKelvey got out of the car and disappeared for a time. Harrell testified that he stood in the parking lot, then got back into the car, never entering Luttrell's Supermarket and not knowing that McKelvey was committing a robbery. When McKelvey returned to the car, Harrell drove off in complete innocence. When they reached the roadblock, he observed two men with .357 magnums and the unmarked police car across the road. He stopped, but was afraid of the armed men

and drove off when they started shooting at him, wrecking his car.

Afraid of the men in pursuit, they walked through the field, hiding behind bushes when they saw a marked police cruiser drive down a road. They stopped at the Green barn as he wanted to call the Sheriff to find out why he was being pursued, but after learning there was no telephone, they borrowed the Green Ford. Soon after they stopped to talk with the girls beside the road, the police car drove up and started shooting at them again and they fled.

Harrell denied having or seeing a pistol in either the Green Ford or in his red Camaro and he denied leaving .22 caliber and .25 caliber ammunition in his red Camaro. He did not own a pistol and did not have one on the day of the Luttrell Supermarket robbery or the day before the robbery. He testified that he had approximately $600 on his person, but that he had obtained it prior to the robbery, and that he only had about $70 in his front pockets. He testified that McKelvey was "high" on that day, but was never "drunk or out of his mind."

Over the objection of the appellants, the State was permitted to prove in rebuttal that on 12 July 1978, the day before the Luttrell Supermarket robbery, the two appellants drove to Tucker Drug Store in Knoxville in Harrell's red Camaro. After parking the car in an alley, McKelvey entered the drugstore, finding the owner, Mr. Basil Tucker, alone. McKelvey asked Mr. Tucker for masking tape and Tucker told him where it could be found. McKelvey got the tape and returned, holding a .22 or .25 caliber pistol on Mr. Tucker. McKelvey ordered Tucker to lie on the floor and taped his eyes so that he could not see. Then, Tucker heard another person come inside the store and go to the prescription room with McKelvey. Mr. Tucker removed the tape after the robbers left and found Mr. Carl Edward Chesney and another person lying next to him. When Mr. Chesney had walked in the store, McKelvey met him with a pistol and ordered him to lie down, face down. A witness outside the drug-

2. However, at one point during his direct testimony, McKelvey volunteered that after leaving the spot where he had talked with the two girls

parked beside the road, "I fired, I don't know how many rounds; I was eating the carpet up."

store observed both appellants entering the store and leaving it.

Various drugs were taken in the drugstore robbery, including a quantity of valium. One bottle of valium found on Harrell at the time of his arrest was identified by Mr. Tucker as being from his drugstore.

Both appellants assign error complaining of the admission of evidence that they committed the armed robbery of Tucker's drugstore the day before the armed robbery of the Luttrell Supermarket. The trial judge instructed the jury that they could consider the evidence of the armed robbery of the drugstore only as to Harrell and only to show "guilty knowledge, intent, and common participation" of Harrell in the robbery of Luttrell Supermarket. As stated, Harrell testified that when he parked briefly in the parking lot of Luttrell's Supermarket to get a beer out of the truck of his automobile, McKelvey left for a time. Harrell denied that he had participated in the robbery with McKelvey, denied knowledge that McKelvey had committed a robbery and denied sharing an intent with McKelvey to commit a robbery. Harrell's defense was based on the issue of his intent, guilty knowledge, and, though present, his participation in the crime, either as a principal in the first degree or as an aider and abettor.

■ Generally, evidence of the commission by an accused of crimes independent of that for which he is being tried is inadmissible. *Wrather v. State,* 179 Tenn. 666, 169 S.W.2d 854 (1943); *Northern v. State,* 541 S.W.2d 956 (Tenn.Cr.App.1976). However, when logic and general experience indicate that evidence of another crime is relevant to the case on trial, then evidence of the other crime is admissible. *Claiborne v. State,* 555 S.W.2d 414 (Tenn.Ct. App.1977); *Ellison v. State,* 549 S.W.2d 691 (Tenn.Cr.App.1976). Proof of the commission of another crime is always relevant and competent when it tends to prove guilty knowledge or criminal intent. *McGowen v. State,* 221 Tenn. 442, 427 S.W.2d 555 (1968); *Miller v. State,* 195 Tenn. 181, 258 S.W.2d 751 (1953); *Miller v. State,* 189 Tenn. 281, 225 S.W.2d 62 (1949); *Laird v. State,* 565 S.W.2d 38 (Tenn.Cr.App.1978); *Russell v. State,* 556 S.W.2d 92 (Tenn.Cr.App.1977);

*Meeks v. State,* 519 S.W.2d 410 (Tenn.Cr. App.1974).

■ The evidence that Harrell had participated with McKelvey in another armed robbery the day before tends to establish guilty knowledge and criminal intent and to refute Harrell's testimony that McKelvey concealed the fact that he committed the robbery of Luttrell's Supermarket. In considering these issues, it was relevant for the jury to weigh Harrell's version in the light of the circumstance that the two of them had committed another armed robbery the day before. .

The appellants argue that the trial judge erred in admitting the evidence to show "common participation" on Harrell's part. As stated, if Harrell did not share an intent to commit the robbery and had no knowledge that a robbery was being or was about to be committed, then Harrell would not be a participant with McKelvey in the commission of the crime. We construed the trial judge's use of the words "common participation" in this light. Harrell admitted being present at the supermarket with McKelvey, but denied participating in a robbery with him because he did not share common intent and guilty knowledge with McKelvey. In this context, the evidence was admissible against Harrell to show "common participation."

■ The appellants further argue, "Any probative value of such evidence was clearly outweighed by its prejudicial effect." This is not a proper inquiry; probative value is weighed against prejudice only when a prior crime is sought to be proved for the purposes of impeachment. *State v. Morgan,* 541 S.W.2d 385 (Tenn.1976). When evidence of a prior crime is sought to be introduced to prove a material element of the crime for which a defendant is being tried, such as intent and guilty knowledge, no such balancing of probative value against prejudicial effect is proper. Relevant evidence is not inadmissible simply because it is prejudicial. *Murray v. State,* 214 Tenn. 51, 377 S.W.2d 918 (1964); *Frost v. State,* 203 Tenn. 549, 314 S.W.2d 33 (1958).

The appellants argue "the State was bound by the answer of defendant denying involvement in the alleged prior robbery, which was a collateral matter." This argument is generally correct with respect to evidence of other crimes introduced for impeachment purposes. *State v. Morgan, supra.* But, this rule is not applicable when the evidence of another crime is direct proof of an essential element of the offense for which a defendant is indicted. In the latter situation, the proof of another crime is not a collateral matter and the State was not bound by the testimony of the accused. See *Lacey v. State,* 506 S.W.2d 809 (Tenn. Cr.App.1974); *Russell v. State,* 489 S.W.2d 535 (Tenn.Cr.App.1972).

The appellants further contend that the evidence of their participation in the drugstore robbery is not "clear and convincing." We disagree. The appellants arrived at the drugstore in Harrell's automobile, they were both identified as being the two persons who entered the drugstore and McKelvey was identified by the drugstore owner and a customer. They were both observed running from the drugstore after the robbery and the next day, after Harrell was arrested for the Luttrell Supermarket robbery, valium from the drugstore was found on him. We view the evidence of the appellants' commission of the drugstore robbery as clear and convincing.

As above stated, the trial judge instructed the jury to consider the evidence of the drugstore robbery only as to Harrell, rendering it moot as to whether the evidence was competent to show McKelvey's intent and guilty knowledge or to impeach his testimony that he was not armed with the pistol on the day before the Luttrell Supermarket robbery. See *Mothershed v. State,* 578 S.W.2d 96 (Tenn.Cr.App.1978).

The appellants aver that there is a fatal variance between the indictment and the proof because the indictment charged that appellants "did forcibly take from the person of the said Imogene Dukes goods or money of value" while the evidence established that the money belonged to Coy Lawson, the owner of Luttrell Supermarket.

We find no variance; the evidence is conclusive that the money was taken from the possession of Imogene Dukes as alleged in the indictment. The fact that Corrie Lawson was the owner of the money did not create a variance between the indictment and the proof and would not create a variance even if the indictment had charged that Imogene Dukes was actually the owner of the money. See *Watson v. State,* 207 Tenn. 581, 341 S.W.2d 728 (1960). This assignment is without merit.

The appellants assign error that the trial judge failed to instruct the jury that before they could convict the appellants of armed robbery, "the jury must first find the defendants possess a specific intent to commit the crime of armed robbery." The record reflects that the trial judge instructed the jury:

"  .  .  . The gist of the offense of robbery, is the taking with the *felonious intent,* of any money, goods or other personal property of any value, from the person of another, or in his presence against his will, or her will, by force or violence, or by putting her in fear, *with the intent to permanently deprive the owner of the property."* (Emphasis supplied)

After giving the above definition, the trial judge instructed the jury that the State must prove every element of the offense to the jury's satisfaction, beyond a reasonable doubt. We find the charge to be adequate with respect to "intent" since it informs the jury that there can be no robbery without a felonious intent or the specific intent to permanently deprive the owner of the property taken. *Young v. State,* 487 S.W.2d 305 (Tenn.1972).

The appellants assign error that the trial judge erred in declining to instruct the jury their special request number two, which stated:

As an exception to the general rule that voluntary drunkenness is generally no defense to a criminal charge, voluntary drunkenness is a defense where specific intent is an essential element of the crime and the Defendant was intoxicated

to the extent that he could not have possessed this intent. Armed robbery is such a crime. That is, before you may convict the Defendant of armed robbery, you must find he actually intended for his acts to have the result of robbing Imogene Dukes with a deadly weapon. If you are not satisfied beyond a reasonable doubt that the Defendant intended to rob Imogene Dukes with a deadly weapon, then you must find him not guilty of Armed Robbery.

It is well settled that voluntary drunkenness is no mitigation of crime except in first-degree murder cases requiring premeditation and deliberation; in such cases voluntary intoxication could reduce the crime to second-degree murder when the drunkenness of the accused renders him incapable of premeditation and deliberation. *State v. Bullington,* 532 S.W.2d 556 (Tenn. 1976).

Voluntary intoxication, whatever may be the degree, will never excuse or justify a criminal act. *Walden v. State,* 178 Tenn. 71, 156 S.W.2d 385 (1941). However, intoxication can be a complete defense in cases where an accused is charged with a crime requiring a specific intent, for the reason that if specific intent is an essential element of a crime and such specific intent is lacking because of the incapacity of the accused to entertain specific intent, the crime has not been committed. *Walden v. State, supra; Bradford v. State,* 208 Tenn. 500, 347 S.W.2d 33 (1961); *Thomas v. State,* 201 Tenn. 645, 301 S.W.2d 358 (1957); *Pirtle v. State,* 28 Tenn. 663 (Tenn.1849); *Claiborne v. State,* 555 S.W.2d 414 (Tenn.Ct. App.1977).

The Tennessee authorities have said very little to define specific intent.[3] After reviewing many authorities on the subject, we adopt the definition and discussion by the Supreme Court of Connecticut, in *State v. Bitting,* 162 Conn. 1, 291 A.2d 240, 242 (1971), distinguishing specific intent from general intent:

"When a mental element is a constituent of a crime, the character of that element must be identified. In determining which of these crimes require proof of a general intent and which require proof of a specific intent, the language chosen by the legislature in enacting a particular statute is significant. When the elements of a crime consist of a description of a particular act and a mental element not specific in nature, the only issue is whether the defendant intended to do the proscribed act. If he did so intend, he has the requisite general intent for culpability. *When the elements of a crime include a defendant's intent to achieve some result additional to the act, the additional language distinguishes the crime from those of general intent and makes it one requiring a specific intent.* (Emphasis supplied)

General Statutes § 53–16 defines aggravated assault as simply "an assault upon another with any deadly . . . weapon." It contains no language of intent, as do other classifications, such as General Statutes § 53–15, assault with acid on other burning substance; § 53–28, assault with intent to rob; § 53–239, assault with intent to commit rape; § 53–240, assault with intent to carnally know a female child. The repeated references to intent in several sections relating to different crimes, and its omission in § 53–16, does not indicate a legislative intent that aggravated assault be characterized as a specific intent crime. Aggravated assault is simply a common-law assault which is committed with the use of a deadly weapon. Thus, the mental element required for a common-law assault is controlling. At common law, an essential element of assault is an intent either to frighten or harm. Such an intent is general in nature and not specific to achieve any particular kind of result or degree of injury. See *People v. Hood,* 1 Cal.3d 444, 82 Cal.Rptr. 618, 462 P.2d 370;

---

**3.** The trial judge expressed the opinion that armed robbery did not require a specific intent; however, the jury was not present. As herein- above stated, the definition of the offense given in his charge was adequate.

*Parker v. United States,* 123 U.S.App. D.C. 343, 359 F.2d 1009; note, 92 A.L. R.2d 635.

The defendant claims that, although courts give lip service to the doctrine that general intent is all that is needed to support a conviction of aggravated assault, this court, in *State v. Pallanck,* 146 Conn. 527, 530, 152 A.2d 633, and again in *State v. Smith,* 157 Conn. 351, 354, 254 A.2d 447, recognized that the crime requires a specific criminal intent to do the proscribed act. In the *Pallanck* case, there was evidence of an intent to frighten and, in the *Smith* case, there was evidence of an intent to frighten and injure. In both cases, we held that the evidence of intent present was sufficient to support conviction. There is no basis for inferring that this court referred to such intents as other than proof of general intent, i. e., proof of general intent to do an act is established if there is proof of an intent to cause fear or harm by means of the act. The appropriateness of such evidence to a determination of guilt rests in the fact that general intent to do the act described in § 53–16 is necessary for conviction. In the *Smith* case, for example, the defendants claimed that their closing a trunk lid on a policeman's head was purely accidental. If that were the case, no general intent would be present. Thus, evidence of intent to cause fear or harm is necessary to show the requisite general intent, thereby negating a defense of accident or negligence.

Considering that only general intent need be proven under General Statutes § 53–16, it would have been error to charge that a showing of specific intent was necessary.

Because voluntary intoxication is relevant only to show an absence of specific intent, it has no relevance to the presence or absence of the general intent required by the statute under discussion. There was, therefore, no error in refusing the defendant's request to charge with respect to his intoxication. *State v. Dennis,* 150 Conn. 245, 250, 188 A.2d 65; *State v. Fiske,* 63 Conn. 388, 392, 28 A. 572; *State v. Johnson,* 41 Conn. 584, 586."

The California courts make the same distinction between general intent crimes and specific intent crimes by the following test:

"When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent." *People v. Norris,* 88 Cal.App.3d Supp. 32, 37, 152 Cal.Rptr. 134, 137 (1978).

Some crimes that require specific intent are assault with intent to commit a felony (§ 39–603); assault with intent to rob (§ 39–607); larceny (§ 39–4202), and kidnapping (§ 39–2601). These statutes require that an accused entertain a specified intent while the proscribed acts are committed; without the presence of the specified intent, the acts denounced by the statutes are insufficient to complete the offenses defined.

Examples of crimes not requiring specific intent are escape (§ 39–3807); incest (§ 39–705), aggravated assault (§ 39–601), and arson (§ 39–501). While these statutes may require guilty knowledge, malice or general criminal intent as essential elements, the definitions require no intent to do some further act other than the act proscribed, nor an intent to achieve some additional consequence.

The definition of the crime of robbery proscribes the taking of property from a person by violence, etc., but requires the specific intent of the additional consequence of permanently depriving the owner of the property taken; therefore, it is in the classification of specific intent crimes. See *Young v. State,* 487 S.W.2d 305 (Tenn.1972).

We must now determine whether the evidence required the granting of the special request concerning drunkenness. McKelvey testified that the night before the rob-

bery of Luttrell's Supermarket, he attended a party where he consumed intoxicating liquors and drugs; he then went to the home of the three young ladies to spend the night. After sleeping for an unspecified length of time, he consumed about a six-pack of beer and seven valiums before the robbery. McKelvey described himself as being "pretty high" and "pretty intoxicated" and said that he was too intoxicated to drive. He testified that valiums always cause a memory lapse and they caused him to lose his memory of the time in which the Luttrell Supermarket robbery occurred. He stated he had no memory of the supermarket, but that the first thing he remembered was the roadblock.

Harrell testified that at the time of the robbery, McKelvey was "high," but not "drunk or out of his mind;" he knew what was "going on" and carried on a conversation with Harrell up to the time of the robbery. Although a police officer testified that McKelvey was intoxicated after the robbery, the evidence reflects that he drove the Green automobile from Green's residence to the point where he stopped to talk with the girls parked on the road.

In *Thomas v. State,* 201 Tenn. 645, 301 S.W.2d 358 (1957), our Supreme Court reviewed a conviction for a specific intent crime where the trial judge had declined a special request similar to the special request in this case. The evidence in the *Thomas* case is also strikingly similar to the case before us. In the *Thomas* case, there was evidence that Thomas was "very drunk" and that amnesia or loss of memory prevented him from remembering the crime.

Citing from numerous authorities, the Supreme Court said in the *Thomas* case that " '[f]ailure to remember later, when accused, is in itself no proof of the mental condition when crime was performed'." In essence, the *Thomas* court also held that proof of being "very drunk" did not, in itself, entitle Thomas to the jury instruction concerning drunkenness in specific intent cases without evidence as to what extent the drunkenness affected his mental capacity to form and entertain specific intent.

In the case before us, with respect to McKelvey, the evidence reflects that the loss of memory was not occasioned by insanity, but by valium, loss of memory being a characteristic of valium. Further, according to McKelvey's testimony, he was "pretty drunk," or "pretty intoxicated." But, he did not testify as to his mental condition at the time of the robbery or offer any evidence as to what extent his mental capacity to form a criminal intent was affected by intoxication. The only evidence on this point is the above-stated testimony of Harrell that McKelvey had control of his faculties.

Proof of intoxication alone is not a defense to a charge of committing a specific intent crime nor does it entitle an accused to jury instructions as requested by the appellants; there must be evidence that the intoxication deprived the accused of the mental capacity to form specific intent. An intoxicated person might have larcenous intent while a sober person might not. The determinative question is not whether the accused was intoxicated, but what was his mental capacity. *Lester v. State,* 212 Tenn. 338, 370 S.W.2d 405 (1963); *Thomas v. State, supra; Walden v. State,* 178 Tenn. 71, 156 S.W.2d 385 (1941); *Simpson v. State,* 1 Tenn.Cr.App. 256, 437 S.W.2d 538 (1968).

There is no evidence or claim by Harrell of excessive intoxication. He testified that he bought three six-packs of beer during the day of the robbery and the night before, but testified that McKelvey drank "a bunch" of these. There is no explicit evidence of intoxication as to Harrell. His defense was that he had no knowledge of the crime, as above stated.

There being no evidence that either appellant was deprived of his capacity to entertain specific intent, the issue was not sufficiently raised by the evidence, and they were not entitled to the special request.

*Lester v. State, supra; Simpson v. State, supra; Thomas v. State, supra.*

■ Finally, we find overwhelming evidence in the record to support the jury verdict. The evidence summarized above is more than sufficient to support a finding of guilt, beyond a reasonable doubt, by a rational trier of fact. Tennessee Rules of Appellate Procedure, Rule 13(e); *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

All assignments of error are overruled and the judgment below is affirmed as to both appellants.

CORNELIUS, J., and JAMES C. BEASLEY, Special Judge, concur.