IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs May 17, 2017

## STATE OF TENNESSEE v. SHELTON STONE GOSS

**Appeal from the Circuit Court for Tipton County**
**No. 8460      Joe H. Walker, III, Judge**

_____

**No. W2016-01227-CCA-R3-CD**

_____

Defendant, Shelton Stone Goss, was convicted by a Tipton County Jury of attempted second degree murder, aggravated burglary, five counts of burglary of a vehicle, two counts of theft under $500, one count of theft over $500, one count of theft over $1,000, employment of a firearm during the commission of a dangerous felony to wit: attempted second degree murder of Joshua Halleron, and possession of a firearm during the commission of a dangerous felony: to wit: aggravated burglary of the Halleron residence. He received an effective fourteen-year sentence to be served in confinement. On appeal, Defendant argues that the evidence was insufficient to support his convictions. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Bryan R. Huffman, Covington, Tennessee, for the appellant, Shelton Stone Goss.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and James Walter Freeland, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

*Background*

Phillip Jackson testified that he lived on Margaret Cove in June 2015, and Defendant lived across the street from him with Defendant's mother, stepfather, and sisters. He had seen Defendant driving a white Dodge Caravan. On June 23, 2015, Mr.

Jackson, who worked as a plumber, awoke at 6:00 a.m., got dressed, and walked out of the house at 6:15 a.m. He opened the passenger door to his work truck and noticed that the glove box was open. Mr. Jackson then discovered that his loaded black Walther PK380 pistol was missing from the driver's door compartment. He also discovered that his DeWalt cordless tool set, sewer snake drill, Milwaukee fix flaring tool, pistol holder, Garmin GPS, Cobalt drill bit set, and Rigid pipe wrenches were missing. Mr. Jackson checked his personal vehicle and found that his cell phone and floor jack were missing. He found that a sander was taken from his back porch, and his vitamins, which he stored in a cooler, were sitting on the porch. Mr. Jackson later discovered a bullet from the Walther PK380 on the floorboard of his work truck. He testified that the first bullet would have fallen out from the magazine and "slid[ ] down the receiver and fall[en] out" if someone removed the magazine from the gun while it was fully loaded with a bullet chambered.

Mr. Jackson testified that he noticed his DeWalt tool bag sitting across the street on Defendant's driveway. The bag was thirty feet from the road and sixty to eighty feet from Defendant's white Caravan. Mr. Jackson knocked on the front door of Defendant's residence and spoke to Defendant's step-father who allowed him to look inside the van. Mr. Jackson personally observed some of his property inside the van, which included the floor jack, Milwaukee hex tool, and copper tubing scraps. He estimated that his property was worth more than $1,000 and that it would have taken the average person "maybe three" trips to move the items taken from his vehicles. Mr. Jackson did not give Defendant permission to enter his vehicles or take his property.

Laura Brown testified that she lived on Shannon Lane in June 2015. At approximately 7:00 a.m. on June 23, 2015, Ms. Brown walked outside to her vehicle to leave for work when she noticed that the vehicle had been ransacked. She said: "The glove compartment was opened, whatever, papers and things I had put over, strolled [sic] everywhere." Ms. Brown also discovered that her loaded Smith and Wesson .38 caliber handgun that had been in the console of her car was missing, and she immediately called police. She thought that she had paid more than $500 for the gun. Ms. Brown testified that all of the loose change that she had in the car was also missing. She did not give Defendant permission to enter her vehicle or take her property.

Brett Kirk testified that he lived on Shannon Lane in June 2015, next door to the Halleron residence. Mr. Kirk, who is a fireman, kept a backpack in the tool box of his truck that contained medical supplies including a first aid kit, surgical masks, a knife, and gloves. He was present on June 23, 2015, when law enforcement officers recovered a surgical mask from between his home and the Halleron residence. Mr. Kirk testified that he did not keep a Smith and Wesson handgun, medicine bottles, or money in the backpack. He estimated that the backpack and its contents were worth less than $500.00. Mr. Kirk did not give Defendant permission to enter his truck or take the backpack.

Joshua Halleron testified that he lived on Shannon Lane in June 2015 with his wife Christina and their infant daughter. Brett Kirk was his neighbor. At approximately 3:30 to 4:00 a.m. on June 23, 2015, Mr. Halleron was awakened by his wife to investigate a noise that she heard in the house. He testified:

> So I walked out of our bedroom, down the hallway. At that point, I was entering the kitchen, and I saw a couple of our kitchen drawers wide open. From that perspective, I have a direct line of sight to the back door, and at that point, I noticed that it was open between 6 inches and a foot. And at that point, that's when [Defendant] came out of the living room, which was directly adjacent to my left, and that's when I encountered him that morning.

Mr. Halleron said that he felt terror, and Defendant told him that "he had a gun and that it was loaded." He did not notice anything strange about Defendant, and Defendant's speech was not slurred or "difficult." Defendant said that he was homeless and looking for food. At that point, Mr. Halleron could not see the weapon because it was dark. However, as he and Defendant made their way into the dining room where the light was on, Mr. Halleron saw the gun in Defendant's hand, and it was pointed at Mr. Halleron.

Mr. Halleron testified that he and Defendant made their way through the house to the back door. He said, "I opened it the rest of the way, I was just going to let him out of the house. He's standing no more than three to five feet away [from] me at this point. Gun point[ed] at my middle of my torso, and that's when he pulled the trigger." Mr. Halleron testified that he heard a "click" but the gun did not fire. He said that Defendant was standing less than five feet when he pulled the trigger. At that point, Mr. Halleron attempted to disarm Defendant, and Defendant pulled the trigger a "minimum of six" times during the struggle. He then directed Mrs. Halleron to get his firearm and call 9-1-1. Mr. Halleron testified that he eventually sat on Defendant and wrestled the gun away from him and placed it on the dining room table. By that time, Mrs. Halleron had a 9-1-1 dispatcher on the phone, and she brought her handgun into the room. Defendant said that he was homeless, that his back hurt, and that police were not going to help him. Two police officers arrived at their house within five minutes.

Mr. Halleron noted that Defendant had been wearing a backpack that fell off during the struggle. He saw officers remove a silver revolver from the backpack along with the Halleron's cell phone, gold jewelry case, Conair Shaver, flip cell phone, radar detector, pack of Extra bubble gum, stun gun, and three bottles of medicine. He noted that the radar detector had been in Mrs. Halleron's car. Mr. Halleron did not notice that any coins had been taken from him but there were $30 missing from his wallet. He later received his property, including the $30, back from police. The revolver did not belong to him. Mr. Halleron estimated that the value of his property was less than $500.00. Mr. Halleron testified that he did not give Defendant permission to take any of his property.

- 3 -

Christina Halleron testified that during the early morning hours of June 23, 2015, she was awakened by a noise that she thought was her mother-in-law's cat. She woke her husband, Joshua, and he started looking around for the noise. Mrs. Halleron then heard another voice that she did not recognize, and she heard Mr. Halleron say, "get the [    ] out of my house." She also heard the other voice say, "[T]he gun is loaded, the gun is loaded." At that point, Mrs. Halleron began looking for either her pistol or her husband's pistol. She heard Mr. Halleron yelling "put the gun down, put the gun down." Mrs. Halleron "snuck" into the living room to get her gun as she was dialing 9-1-1. She heard Mr. Halleron yell, "Get my 40, get my 40." She could see Mr. Halleron with his hands on Defendant's hands and holding him down. She also heard the "click, click, click" of a gun. Mrs. Halleron got her gun and pointed it at Defendant while Mr. Halleron wrestled the gun away from Defendant and placed it on the dining room table. She said that Defendant told them that he was homeless and had no food. However, Mrs. Halleron noted that their pantry was full, and Defendant had not taken any food.

Officer Daryl Smith of the Atoka Police Department testified that on June 23, 2015, at approximately 3:58 a.m., he responded to a call at the home of Joshua and Christina Halleron on Shannon Lane. Officer Mark Newson was already on the scene attempting to handcuff an intruder. Officer Smith saw Mrs. Halleron holding a handgun. Officer Smith took the gun and assisted Officer Newsom with handcuffing the intruder, who was identified as Defendant. Officer Smith later observed a black automatic weapon lying on a table in the residence. Mr. Halleron had indicated that he took the gun from Defendant. He noted that the magazine was loaded backwards in the gun. When Officer Smith took the magazine out of the gun he noticed that "it had a shell casing inside of it that was kind of cocked up the wrong way." He placed the items into an evidence bag.

Officer Smith testified that he found a silver revolver in a black backpack that Defendant was carrying. The backpack also contained a first aid kit, a knife, and a light stick. Officer Smith recovered from the backpack the Halleron's cell phone, jewelry case, Conair shaver, a flip cell phone, a radar detector, a pack of gum, a stun gun, and three bottles of medicine.

Detective Chris Ellwood of the Atoka Police Department testified that on the morning of June 23, 2015, he met Officer Smith at the police station and learned that there had been an incident at the Halleron residence located on Shannon Lane. He then helped Officer Smith process evidence including two loaded weapons and a backpack recovered from the scene. At approximately 6:30 a.m., he and Officer Strickland received a call about property that had been taken from a truck on Margaret Cove belonging to Phillip Jackson who reported that his Walther PK380 had been stolen. Detective Ellwood testified that he also met with Laura Brown, Brett Kirk, and Joshua and Christina Halleron who lived on Shannon Lane. He explained that Shannon Lane loops over Margaret Cove. He also said that Defendant lived in a residence on Margaret

Cove directly across from Mr. Jackson's residence. Detective Ellwood and Officer Strickland processed the scene at Mr. Jackson's house, and he noticed a bag full of tools sitting in the driveway of the home that Defendant shared with his mother and stepfather. Detective Ellwood testified that he found a blue and white surgical mask in the grass between Mr. Kirk's house and the Halleron's property. There was also a similar mask found by Officer Smith inside the Halleron's home. Detective Ellwood testified that Ms. Brown had reported that her .38 caliber Smith and Wesson handgun had been stolen from her house.

Detective Ellwood testified that the Smith and Weapon handgun was recovered, and he verified that the weapon was functional. He said that the Walther PK380 handgun was also recovered. Detective Ellwood noted that a Walther PK380 is a semiautomatic handgun that is "double action" and almost acted as a revolver. He testified that the weapon was tested, and he verified that it was functional. Detective Ellwood testified that a Walther PK380 is unusual in that it is easy to load the magazine in backwards, and even if loaded backwards, the magazine will lock and stay in place. He further testified that when the magazine is loaded backwards and the trigger is pulled, the double action will move forward, cock back, and move forward again. Detective Ellwood said that the rounds will not fire, and the gun makes a "click, click" sound. He agreed that the gun will not fire unless there is a round in the chamber, and a round cannot be loaded into the chamber if the clip is in backwards.

Shirley Adams, Defendant's mother, testified that Defendant was living with her and her husband on Margaret Cove on June 23, 2015. She said that Defendant had been "upset a lot" a few days prior to that because he was "going through some things." Mrs. Adams testified that she tried to talk to Defendant but he would not tell her anything. She saw that he had posted on Facebook about committing suicide. She said that the white van parked in her driveway belonged to her daughter, Shelby. Mrs. Adams also noted that anyone in the home had access to drive the van and that it was an extra vehicle. She said that the driver's side window of the van would not roll up, and anyone walking down the street could open the vehicle.

On the morning of June 23, 2015, Phillip Jackson visited her house and spoke to her husband. She said that Mr. Jackson had noticed a bag of tools sitting on their driveway. Mrs. Adams saw the bag of tools and noticed that the sliding door to the van was open, and the interior light was on. She later spoke with police and learned that Defendant had been arrested on Shannon Lane.

Defendant testified that on the night of June 22, 2015, he picked up some Xanax and Lortab pills from someone that he knew. He said that things were falling apart in his life, and he "started falling in drugs to ease the pain, to take the pain away." Defendant noted that he had lost his job, and he and his biological father were not speaking to each other much. Defendant thought that he took six or seven Xanax pills and one or two

- 5 -

Lortabs. He could not recall the effect that the pills had on him. Defendant said that before taking all of the pills, he remembered pulling into the driveway and going inside the house to take a shower. He took the pills before leaving the house, got into his vehicle, and drove away. Defendant said that he drove to the stop sign at the end of Margaret Cove and discovered that he had a flat tire. He then turned around and drove back home. Defendant said that he asked his mother about using another vehicle and she said, "[N]o." He testified that he looked for a spare tire and could not find one. Defendant said, "By then, I don't really remember much, but I remember walking across the street breaking into somebody's truck." He also remembered "grabbing a pistol[.]" Defendant testified that he did not remember going to the Halleron's house or breaking into Ms. Brown's vehicle. Defendant claimed that the next thing he remembered was waking up in the jail. He said that he did not remember meeting with Professional Care Services, and he "slightly" recalled the interview with police two days after the offenses took place.

On cross-examination, Defendant admitted that he was not homeless on June 23, 2015, and he did not recall telling anyone that. Defendant agreed that he had a home and food, and even though he was unemployed, he had everything that he needed. His sister allowed him to drive the white Caravan. Defendant testified that he did not know that Mr. Jackson had the gun in his truck, and he did not recall taking the magazine out of the gun and putting it back in the wrong way or the bullet that fell out of it. Concerning the theft at Mr. Jackson's house, Defendant testified: "I remember grabbing a gun and seeing stuff in the back and I started unloading it, and then I don't remember anything after that." He did not recall taking vitamins from Mr. Jackson's cooler and leaving them on the porch. Defendant said that he did not know Laura Brown, and he did not recall taking the silver Smith and Wesson handgun from her vehicle. He also did not recall being inside the Halleron's house or pointing the gun at Mr. Halleron and pulling the trigger. Defendant could not explain why he rummaged through the medicine cabinet at the Halleron home. He did not remember Brett Kirk or taking the backpack from Mr. Kirk's vehicle.

*Analysis*

Defendant argues that the evidence is insufficient to sustain his convictions for attempted second degree murder of Joshua Halleron, aggravated burglary of the Halleron's home, five counts of burglary of a vehicle, two counts of theft under $500, one count of theft over $500, one count of theft over $1,000, employment of a firearm during the commission of a dangerous felony to wit: attempted second degree murder of Joshua Halleron, and possession of a firearm during the commission of a dangerous felony to wit: aggravated burglary of the Halleron residence. More specifically, he contends: "The Jury Failed to Properly Consider Appellant's Voluntary Intoxication Defense to the Requisite *Mens Rea*," and also asserts that his intoxication "negated the mens rea required" for the offenses for which he was charged with and convicted of committing.

We review Defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

Voluntary intoxication is not in itself a defense to prosecution, but it "is admissible in evidence, if it is relevant to negate a culpable mental state." T.C.A. § 39-11-503(a). In *Harrell v. State*, 593 S.W.2d 664 (Tenn. Crim. App. 1979), this Court set forth the rule as to when the proof requires a voluntary intoxication instruction:

> Proof of intoxication alone is not a defense to a charge of committing a specific intent crime nor does it entitle the accused to jury instructions ...; there must be evidence that the intoxication deprived the accused of the mental capacity to form specific intent. . . . The determinative question is not whether the accused was intoxicated, but what was his mental capacity.

*Id.* at 672 (citations omitted). The weight to place on such evidence and "the determination of whether the voluntary intoxication negated the culpable mental elements" are issues to be resolved by the jury. *State v. Morris*, 24 S.W.3d 788, 796 (Tenn. 2000).

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103. Tennessee Code Annotated section 39-14-402(a)(4) (2003) states, in relevant part, that: "[a] person commits burglary who, without the effective consent of the property owner: . . . (4)[e]nters any . . . passenger car, automobile, or truck . . . with intent to commit a felony, theft or assault or commits or attempts to commit a felony, theft or assault." Aggravated burglary is defined as

"burglary of a habitation." T.C.A. § 39-14-403(a). "Habitation" means "any structure, including buildings, module units, mobile homes, trailers, and tents, which is designed or adapted for the overnight accommodation of persons." T.C.A. § 39-14-401(1)(A). "'Habitation' also includes garages and other outbuildings that are 'separately secured and occupied portions' of a habitation." T.C.A. § 39-14-403, Sentencing Comm'n Cmts.

Second degree murder is defined as "[a] knowing killing of another." T.C.A. § 39-13-210(a)(1), and is a "result of conduct" knowing offense. *State v. Page*, 81 S.W.3d 781, 788 (Tenn. Crim. App. 2002). A person acts "knowingly" with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. *Id.* § 39-13-302(b). Criminal attempt occurs when a person "acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." T.C.A. § 39-12-101(a)(2). The offense of employing a firearm during the commission of a dangerous felony requires proof of the following three elements: (1) that defendant employed a firearm; (2) that employment was during the commission or attempted commission of a dangerous felony; and (3) that defendant acted intentionally, knowingly, or recklessly. T.C.A. §§ 39-11-301(c), 39-17-1324(b). Possession of a firearm during the commission of a dangerous felony requires proof that: (1) the defendant possessed a firearm; (2) the possession was with the "intent to go armed; and (3) the first two elements occurred during the commission or attempted commission of a "dangerous felony." T.C.A. § 39-17-1324(a); *See also State v. Fayne*, 451 S.W.3d 362, 369-70 (Tenn. 2014). Aggravated burglary and attempted second degree murder are defined as a "dangerous felony." T.C.A. § 39-17-1324(i)(1)(B) and (H).

In this case, Defendant does not contest that the sufficiency of the convicting evidence as to the non-mens rea elements of the offenses. Defendant argues that he could not form the requisite specific intent to commit the offenses due to his alleged intoxication. However, the jury rejected Defendant's claim of voluntary intoxication, as was its prerogative. The Defendant is entitled to no relief on this basis. We conclude that there was sufficient evidence beyond a reasonable doubt to support Defendant's convictions for attempted second degree murder, aggravated burglary, five counts of burglary of a vehicle, two counts of theft, theft over $500, theft over $1,000, employment of a firearm during the commission of a dangerous felony, and possession of a firearm during the commission of a dangerous felony. Defendant is not entitled to relief on this issue.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, PRESIDING JUDGE