# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

## MARCH 1997 SESSION



FILED

July 14, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| TERRY LYNN KING, | ) | |
| | ) | C.C.A. NO. 03C01-9601-CR-00024 |
| Appellant, | ) | |
| | ) | KNOX COUNTY |
| VS. | ) | |
| | ) | HON. MARY BETH LEIBOWITZ, |
| STATE OF TENNESSEE, | ) | JUDGE |
| | ) | |
| Appellee. | ) | (Post-conviction: capital case) |

FOR THE APPELLANT:                    FOR THE APPELLEE:

CHARLES W. B. FELS                    JOHN KNOX WALKUP
WADE V. DAVIES                        Attorney General & Reporter
606 W. Main St., Suite 300
Knoxville, TN   37901                 JOHN P. CAULEY
                                      Asst. Atty. General
KENNETH F. IRVINE, JR.                      450 James Robertson Pkwy.
          606 W. Main St., Suite 350        Nashville, TN  37243-0493
Knoxville, TN   37901
                                      RANDALL E. NICHOLS
                                      District Attorney General

                                      ROBERT L. JOLLEY, JR.
                                      WILLIAM  CRABTREE
                                      JOHN W. GILL
                                      Asst. District Attorneys General
                                      City-County Bldg.
                                      Knoxville, TN   37902

OPINION FILED:_____

AFFIRMED

JOHN H. PEAY,
Judge

## O P I N I O N

The petitioner was convicted by a jury on February 1, 1985, of first-degree (felony) murder and armed robbery.[1] He was sentenced to death for the first-degree murder offense and to one hundred twenty-five (125) years for the robbery offense. His convictions and sentences were affirmed on direct appeal. State v. King, 718 S.W.2d 241 (Tenn. 1986). The petitioner subsequently filed for post-conviction relief which was denied after a hearing. He now appeals, raising the following issues:

> I. The aggravating factors used in imposing the death sentence were either constitutionally flawed or impermissibly tainted by inadmissible evidence;
>
> II. The trial court's failure to grant a severance violated Bruton v. United States and Cruz v. New York at trial and violated his due process rights at sentencing;
>
> III. Trial and appellate counsel were ineffective;
>
> IV. The trial court's failure to instruct the jury on second degree murder and voluntary intoxication violated his constitutional rights;
>
> V. The trial court's instruction on reasonable doubt violated his due process rights;
>
> VI. The prosecution violated his due process rights by offering inadmissible, irrelevant and inflammatory evidence during both the guilt and penalty phases of his trial; and
>
> VII. He is entitled to a new trial and/or a new sentencing hearing based on cumulative error.

Finding no reversible error in the lower court's rulings on these issues, we affirm the judgment below.

## FACTS

A brief recitation of the facts established at the petitioner's trial is sufficient for the purposes of this proceeding. On the afternoon of July 31, 1984, the petitioner and his cousin, Don King, were driving around Cherokee Lake together when they met the

---

[1]The petitioner was also convicted of aggravated kidnapping. This conviction was set aside by the trial court on March 8, 1985.

victim, Diana K. Smith. The three left and drove to Don King's trailer, the petitioner riding with the victim in her car. The petitioner subsequently obtained some LSD. He and the victim both took some of the LSD. The petitioner had also taken one or more Quaalude tablets and had been drinking beer all day. The victim had been drinking wine and continued to do so after arriving at Don King's trailer.

The proof established that the petitioner engaged in sex with the victim and that they went driving around in her car. At some point she asked him, "Why did you all rape me?"[2] The petitioner subsequently made her get into the trunk of her car and drove to the house where his friend, co-defendant Randall Joe Sexton lived. Here, the petitioner spoke with Sexton and obtained Sexton's rifle. He returned to the victim's car and drove off. Sexton accompanied the petitioner in his own car. Eventually, the petitioner drove to a wooded area near a creek where he made the victim get out of the trunk of her car and lie facedown on the ground. He then shot her in the back of her head at least once, killing her. The petitioner and Sexton returned the next day to dispose of the body, wrapping it in a tent, weighting it down with cinder blocks and then throwing it into a quarry lake. The body was discovered several days later. Following their arrests, both Sexton and the petitioner made statements to the police after waiving their rights. Both men were tried together.

**ANALYSIS**

As a preliminary matter, we first note that "[i]n post-conviction relief proceedings the petitioner has the burden of proving the allegations in his petition by a preponderance of the evidence." McBee v. State, 655 S.W.2d 191, 195 (Tenn. Crim. App. 1983). Furthermore, the factual findings of the trial court in hearings "are conclusive

---

[2]Don King testified during the sentencing hearing that he had also had sex with the victim while they were at his trailer. The only proof that the victim's sex with either Don King or the petitioner was anything other than consensual was the victim's question to the petitioner, as reported in his confession to the police.

3

on appeal unless the evidence preponderates against the judgment." State v. Buford, 666 S.W.2d 473, 475 (Tenn. Crim. App. 1983).

## I. AGGRAVATING FACTORS

In his first issue, the petitioner asserts that two of the four aggravating factors relied upon by the jury in imposing the death sentence "could not be constitutionally applied to the facts of this case" and that the remaining two factors "were impermissibly tainted by evidence which was erroneously admitted by the trial court." The four aggravating factors found by the jury were the following:

> 1. The petitioner was previously convicted of one or more felonies, other than the present charge, which involved the use or threat of violence to the person;
>
> 2. The murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind;
>
> 3. The murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the petitioner or another; and
>
> 4. The murder was committed while the petitioner was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any rape, robbery, larceny or kidnapping.

T.C.A. § 39-2-203(i)(2), (5), (6), and (7) (1982 Repl).

With respect to the last of these factors, the petitioner alleges that our Supreme Court's opinion in State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992), requires this Court to conclude that the use of the felony murder aggravator in this case was unconstitutional.[3] The State disagrees, citing State v. Hines, 919 S.W.2d 573 (Tenn. 1995), in which our Supreme Court held that "Where . . . a felony not underlying the

---

[3]In Middlebrooks, our Supreme Court held that "when the defendant is convicted of first-degree murder solely on the basis of felony murder, the aggravating circumstance set out in Tenn. Code Ann. §§ 39-2-203(i)(7) (1982) and 39-13-204(i)(7)(1991), does not narrow the class of death-eligible murderers sufficiently under the Eighth Amendment to the U.S. Constitution, and Article I, § 16 of the Tennessee Constitution because it duplicates the elements of the offense. As a result, we conclude that Tenn. Code Ann. § 39-2-203(i)(7) is unconstitutionally applied under the Eighth Amendment to the U.S.Constitution and Article I, § 16 of the Tennessee Constitution where the death penalty is imposed for felony murder." 840 S.W.2d at 346.

4

felony murder conviction is used to support the felony murder aggravating circumstance," there is no <u>Middlebrooks</u> error. 919 S.W.2d at 583.

In support of its argument, the State asserts that the petitioner was found guilty of felony murder "solely on the basis of kidnap[p]ing." Although the State cites to no portion of the record in support of this assertion, the charge to the jury on felony murder included as the underlying felony only the offense of kidnapping. Moreover, the jury stated to the trial court that the murder conviction was for count three of the indictment. Count three of the indictment alleged that the petitioner and his co-defendant had murdered the victim "while during the perpetration of a kidnapping."

The charge given to the jury during the penalty phase of the trial included the following instruction:

> No death penalty shall be imposed but upon a unanimous finding by the jury that one or more of the following specified statutory aggravating circumstances have been proved on the trial and/or on the sentence hearing beyond a reasonable doubt.
> . . .
> The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit any rape, robbery, larceny, or kidnapping.
>
> Rape is the unlawful carnal knowledge of a woman, forcibly and against her will.
>
> Robbery is the felonious and forcible taking of the goods or money of any value from the person or presence of another by violence or putting the person in fear.
>
> Kidnapping is the offense of forcibly or unlawfully confining, inveigling, or enticing away another with the intent of causing him to be secretly confined or imprisoned against his will.
>
> Any person who feloniously takes and carries away the personal goods of another with the intent to permanently deprive the true owner thereof is guilty of larceny.

Thus, the jury was given the choice of four felonies from which to choose in determining whether the felony murder aggravating circumstance applied. However, it is impossible

to discern from the record which of the four felonies the jury relied upon in determining to apply this aggravator.

Nevertheless, State v. Hines appears to require this Court to find that no Middlebrooks error was committed under the facts of this case. In Hines, the defendant had been convicted of felony murder "solely on the basis of armed robbery." 919 S.W.2d at 583. However, our Supreme Court went on to find that "the felony underlying the conviction in this case is clear, as is the use of the two different and additional felonies [of larceny and rape] to establish the aggravating circumstance found by the jury." Id. In finding Middlebrooks inapplicable, the Court stated:

> Where, as in the instant case, a felony not underlying the felony murder conviction is used to support the felony murder aggravating circumstance, there is no duplication. Furthermore, under these facts the aggravating circumstance as applied restricts the sentencer's discretion to those who kill while in the perpetration of multiple felonies, a class of murderers demonstrably smaller and more blameworthy than the general class of murderers eligible for the death penalty under the . . . felony murder statute. . . . Under these circumstances, where a felony other than that used to prove the substantive offense is used to establish the aggravating circumstance, there is no constitutional prohibition against the use of the [felony murder] aggravating circumstance . . . to support the imposition of the death penalty for felony murder.

Hines, 919 S.W.2d at 583.

The Hines opinion does not reveal how the Court came to its conclusion that the jury's use of the rape and larceny felonies in establishing the aggravating circumstance was "clear." In a footnote, the opinion acknowledges that the jury found that the murder had been "committed while the defendant was engaged in committing or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any robbery, larceny, or rape." 919 S.W.2d at 582 n.3 (emphasis added). Moreover, in what appears to be a contradictory position, the Court went on to conduct a harmless error analysis "[o]n the premise that error existed because the jury based its finding regarding the felony murder aggravating circumstance

6

in part on the robbery." 919 S.W.2d at 583.

Nevertheless, the crux of the Court's reasoning appears to be that the defendant had been engaged in multiple felonies at the time he killed the victim.[4] In contrast, the defendant in Middlebrooks had been found guilty of first-degree felony murder and aggravated kidnapping (the felony on which both the murder conviction and the aggravating circumstance were based), but acquitted of premeditated murder, armed robbery, and aggravated sexual battery. Middlebrooks, 840 S.W.2d at 322. Therefore, Middlebrooks involved a murder committed in the commission of only a single felony.

In the instant case, the petitioner was convicted of felony murder solely on the basis of kidnapping. In addition to kidnapping, however, the felony murder aggravating circumstance was supported by three additional felonies: robbery, larceny and rape. Indeed, the petitioner was convicted of armed robbery in addition to felony murder. Moreover, in the direct appeal of this case, our Supreme Court found, according to the petitioner's confession, "that the victim had accused him of raping her, and that he had taken a gold cigarette lighter belonging to [the victim] during the criminal episode." King, 718 S.W.2d at 250. Accordingly, the Court held, the trial court had been justified in including the felonies of rape and larceny in the felony murder aggravator. Therefore, while the petitioner was not convicted of either rape or larceny, this fact did not preclude the jury from relying on either or both of these felonies in assessing the applicability of the felony murder aggravator. Thus, the petitioner was presented as a member of the class of murderers who kill during the perpetration of multiple felonies, "a class of murderers demonstrably smaller and more blameworthy than the general class of murderers eligible for the death penalty" under the felony murder statute as duplicated by the felony murder aggravator. Hines, 919 S.W.2d at 583. Accordingly, we disagree

---

[4]However, the opinion does not indicate whether Hines was either indicted for or convicted of any other offenses.

7

with the court below that the felony murder aggravating circumstance was improperly applied in this case, and hold that there was no Middlebrooks error.

However, as did the Hines court, we also conduct a harmless error analysis out of concern that error was committed because the jury based its finding regarding the felony murder aggravating circumstance in part on the kidnapping. See Hines, 919 S.W.2d at 583. As set forth more fully below, we have determined that the remaining three aggravating circumstances were properly applied in this case, and that the evidence strongly supported them. The State's closing arguments did not give extraordinary weight to the felony murder aggravator. The petitioner's prior felony convictions involving violence were not disputed. The petitioner admitted during the penalty phase that he had "probably" killed the victim because she had said "something about rape" and he "got scared." This admission was more than sufficient to support the aggravating factor that he had committed the murder to avoid prosecution. The evidence also supported application of the "heinous, atrocious or cruel" aggravator. As did our Supreme Court in Hines, then, we find that "[u]nder this record it can be concluded beyond a reasonable doubt that the sentence would have been the same had the jury given no weight to the [felony murder] aggravating factor." 919 S.W.2d at 584. See also State v. Howell, 868 S.W.2d 238, 260 (Tenn. 1993) (the applicable harmless error analysis requires the reviewing court to conclude beyond a reasonable doubt that the sentence would have been the same had the jury given no weight to the invalid aggravating factor).

The petitioner also contends that the jury's finding that the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind must be set aside as unconstitutionally applied. In support of his argument, the petitioner complains about the jury instructions given (and those omitted) on this aggravating factor, and about the sufficiency of the evidence supporting this factor. However, our Supreme Court has previously addressed both of these issues, holding

8

we find [no] prejudicial error in the trial court's failure to define the term ‹torture.' The evidence in this case supports the aggravating circumstance, Tenn. Code Ann. § 39-2-203(i)(5), as defined in <u>State v. Williams</u> . . . as the [petitioner] shot the victim in the head after she begged for her life and offered the [petitioner] money to let her go. Furthermore, the remaining three aggravating circumstances were correctly charged and are overwhelmingly supported by the evidence. Under these circumstances, there was no prejudice to the [petitioner] by the failure to define ‹torture.'

<u>King</u>, 718 S.W.2d at 249. Accordingly, this issue has been previously determined. T.C.A. § 40-30-112(a). Moreover, although not noted by the Supreme Court in the direct appeal of this case but made plain by the record, the petitioner had trapped the victim in the trunk of her own car for some thirty to forty-five minutes immediately prior to shooting her. We think this treatment of the victim constituted severe mental pain[5] as contemplated by this aggravating circumstance.[6] Accordingly, this aggravator was not applied unconstitutionally.

With respect to the remaining two aggravating factors found by the jury, the petitioner contends that they were "impermissibly tainted by the introduction of improper evidence by the State." Specifically, the petitioner attacks the admission of evidence about his two juvenile convictions for armed robbery and proof of another charge lodged while he was a minor, accusing him of assisting in the rape of his sister-in-law. Our Supreme Court determined on the direct appeal of this matter that the admission of the juvenile convictions was harmless error as to the application of the aggravator for prior felonies involving violence. <u>King</u>, 718 S.W.2d at 248. Accordingly, that issue has been

---

[5]The term "torture" as used in this aggravating circumstance has been defined by our Supreme Court as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." <u>State v. Williams</u>, 690 S.W.2d 517, 529 (Tenn. 1985).

[6]This case is distinguishable from <u>State v. Christopher S. Beckham</u>, No. 02C01-9406-CR-00107, Shelby County (Tenn. Crim. App. filed Sept. 27, 1995, at Jackson), perm. to appeal granted and remanded for resentencing (Tenn. 1996). In <u>Beckham</u>, the victim had been handcuffed and driven around in a pick-up for two hours and then taken out of the truck and shot in the head while begging for his life. This Court held that the "especially heinous" aggravating circumstance was not supported by sufficient evidence because "[what] happened while . . . the appellant, and the victim were riding around in the truck is pure speculation. The fact that there was a time lapse between the abduction of the victim and the actual murder does not alone support a finding that the victim was mentally tortured." In contrast, being locked in the trunk of a car is obviously and profoundly different in its capacity to cause mental suffering than being held as a passenger in a vehicle, even while handcuffed.

previously determined. T.C.A. § 40-30-112(a). As to the other charge, the alleged harmful effect of that evidence was not raised in the direct appeal. Accordingly, any complaint about the admission of that evidence has been waived. T.C.A. § 40-30-112(b).

Furthermore, we are confident that our Supreme Court's ruling would have been the same had the admission of the rape allegation been raised. In addressing this issue with respect to the juvenile robbery offenses, it held:

> While it is true that one of the aggravating circumstances found was that the [petitioner] was previously convicted of one or more felonies which involved the use or threat of violence to the person, the finding was not dependent on the evidence that the [petitioner] had committed crimes while a juvenile. It is undisputed in the record that in addition to the murder of Mrs. Smith, the [petitioner] had been convicted of murder in the first degree in the perpetration of an armed robbery, aggravated kidnapping, and an assault with intent to commit aggravated kidnapping. In view of this evidence, the error in admitting evidence of [the petitioner's] crimes as a juvenile could not be prejudicial.

King, 718 S.W.2d at 248-49. The only evidence concerning the rape charge consisted of the prosecution asking the petitioner's brother during the penalty phase of the trial, "is it not correct, sir, that in January of 1979, more specifically January the 24th of 1979, that your wife, Donna J. King, accused Mr. Terry Lynn King, your brother, of assisting in her rape?" to which the witness responded, "Yes, sir." Given our Supreme Court's ruling on the issue of the juvenile robbery offenses, we are convinced that its ruling would have been the same had the allegation of error also included the admission of this evidence.

The petitioner's claim that his death sentence must be reversed because of improper application of the aggravating factors is without merit.

## II. BRUTON/CRUZ ERRORS

The petitioner next complains that his constitutional rights were violated by the trial court's refusal to sever the trials of he and his codefendant, Randall Joe Sexton.

10

Sexton did not testify during the guilt/innocence phase of the trial. However, the trial court ruled his confession to be admissible and gave the jury a limiting instruction that the confession was to be used only against Sexton. The petitioner now contends that the admission of Sexton's confession violated his Confrontation Clause rights under Bruton v. United States, 391 U.S. 123 (1968).

In the direct appeal of this matter, our Supreme Court ruled on this issue and found "no Bruton violation in the admission in evidence of the confessions." King, 718 S.W.2d at 247. However, since our Supreme Court's opinion, the United States Supreme Court decided the case of Cruz v. New York, 481 U.S. 186 (1987). In Cruz, the Supreme Court held that "where a nontestifying codefendant's confession incriminating the defendant is not directly admissible against the defendant, . . . the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him." Cruz, 481 U.S. at 193. The petitioner now contends that Cruz must be applied retroactively, and that we should find that the admission of Sexton's statement was constitutional error.

We find it unnecessary to decide whether or not Cruz is to be applied retroactively. Even if it were, Cruz provides for a harmless error analysis where a codefendant's confession is admitted in violation of the Confrontation Clause. 481 U.S. at 194. Although the petitioner contends that the admission of Sexton's confession was very harmful, we disagree. The crux of the petitioner's argument is based on a single statement contained in Sexton's confession: "Terry said he wasn't going to let her go, because he was afraid he would get in the same mess he got into with Lori." This "same mess" was not specifically explained. However, Lori Eastman Carter testified during the guilt phase that the defendant had assaulted her in 1982 and that she had subsequently sworn out a warrant against him. She also testified that, during the assault, the petitioner

11

had told her to "tell him how it felt to be dying, so that the next woman he killed he would know how she felt." The admission of this testimony was found to have been error, although harmless, on direct appeal. King, 718 S.W.2d at 246-47.

The portion of Sexton's statement targeted by the petitioner as prejudicial, together with Carter's testimony, supported the State's attempt to prove the petitioner guilty of premeditated murder. The petitioner was not, however, convicted of premeditated murder: he was convicted of felony murder and armed robbery. And while we acknowledge that this portion of Sexton's confession was somewhat probative of the petitioner's state of mind with respect to his motives in kidnapping and killing the victim, the petitioner's murder conviction did not depend on his motives. We conclude, therefore, that the admission of Sexton's statement, insofar as it was offered to prove the petitioner's state of mind, was harmless error, if error at all.

We further conclude that the admission of Sexton's confession was, in all other respects as to the guilt phase of the trial, harmless error. In pertinent part, Sexton's confession provided as follows:[7]

> Terry came and got me up and said he needed my help. Terry said he wasn't going to let her go, because he was afraid he would get in the same mess he got into with Lori. Terry told me that the girl's name was Smith, and she lived up around Talbott. Terry told me he had met the girl at the lake, and they had been down at Don King's house partying, f-----g her. Terry told me she had tried to get away when they went down to the Pilot, that he had grabbed the keys to the car. Terry told me that he had choked her and put her in the trunk of the Camaro. I followed him in my car, a 1970 blue Audi, from my grandmother's down the road. I ran out of gas, and he pushed me with the Camaro to the Publix station. Before we left the house, Terry told me to get my rifle. It is a .30-30 lever-action rifle. Terry put the rifle in the seat of the Camaro. At the Publix I bought five dollars' worth of gas for my car and five dollars in a gas can for the Camaro. Terry had left it parked up the road from the gas station. We drove down Old Rutledge Pike to the creek where the old covered bridge used to be. Terry drove the Camaro down into the wooded area near the creek. I stayed on the paved portion of the road with my car running. I left and took a funnel back to the Publix

---

[7]As read to the jury by TBI agent David Davenport.

12

station and got me a Coke. I drove back down to the creek and drove into the wooded area. I saw the Camaro. It was stuck. I helped him get it unstuck. Terry told me he had already killed the girl. Terry told me he laid the girl down on her stomach, and that while she was begging for him not to, he shot her in the back of the head. Terry told me he had covered the body up with some weeds.

While the admission of this confession would certainly have been harmful error had there been no other evidence against the petitioner, there was overwhelming additional evidence: including the petitioner's own confession to the police and his earlier confession to Jerry Dean Childress. Childress testified, in pertinent part, as follows:

[The petitioner] said that -- started telling me about it and said that he was with this -- they picked this girl up at Cherokee Lake on the Sunday before that, that Monday, and that -- he said that he -- said he f-----d her, and that they done a Quaalude or two or hit of acid, and that this -- he said this other person was with him, and that he tried to f--k the girl, and she said that if he did, that she was going to holler rape on them. And he said that he got scared and he couldn't -- he had been in jail before, and he wasn't going back to jail.
. . .
And he said he locked -- locked the girl in the trunk of [her] car . . . and sent this other person after a .30-30 rifle --
. . .
he told me that he made the girl get out of the trunk of the car, lay facedown on the ground --
. . .
He said that she was talking to him and begging him not to shoot her, and that she told him she had some money in the bank, and that she would give it to him and forget all about it if he'd let her go. And he told her to shut her damn mouth and turn her head away from him.
. . .
He said he took the gun and put it to the back of her head and shot her.

Likewise, the petitioner's statement to the police included the following:[8]

We got back in the car and rode to the Pilot station on Rutledge Pike to get some gas. I told her to pump the gas, and when she got out, she grabbed the keys. I told her to get in the car, I was leaving. She got in the car, and I took off back to Lee Springs, and I screwed her again. We sat and talked. I knew she had forty dollars on her. I took it and asked her if she had any more money. She said she had two hundred dollars in the bank. She asked me why, and she said, Why did you all rape me? I told her we didn't. And at that time I knew what she was going to do, and I knew what I was going to do. I told her to get out and get in the trunk of the car. I had to take a crank and some pistons out of the trunk and a pinkish bucket and some wrenches to make room for her to get in. She got in the trunk, and I went to [Sexton's] grandmother's house on Lee Springs and got Joe

---

[8]As read to the jury by agent Davenport.

13

Sexton up. I told him I needed his help. I told him I had a girl in the back of the car in the trunk. Joe's grandmother came out, and he told her my car was off in a ditch, and he was going to help me. He got his grandmother out of the living room, and I got his Marlin .30-30 rifle. Joe got a bullet. Joe got a mattock and shovel. And he said, Do you know what you're going to do? and I said I had a pretty good idea. We left. Joe was driving his car; I was driving [the victim's car]. A little ways down the road Joe ran out of gas, and I pushed him in the [victim's car] to the Publix station. As we approached the station, I ran out of gas, too. Joe got five dollars of gas in his car and five dollars' worth of gas in a gas can and borrowed a funnel from the gas attendant. We left and went to the creek by the old covered bridge. I pulled up in a wooded area and got stuck. I made the girl get out of the trunk. I had loaded the rifle and was pointing it at her. This was daylight. And I took the girl over into some weeds and made her lay down. She asked me what I was going to do, if I was going to kill her. I said, no, some more guys are going to screw you. I started covering her up with weeds. I told her this was so she couldn't be seen. I still had the gun. She was laying facedown. I picked up the rifle, held it approximately 3 feet from the back of her head and shot her. [Sexton] wasn't there. We got the [victim's car] unstuck after [Sexton] came back. We then went through her personal belongings. I burned her pictures and I.D. and panties. [Sexton] walked over and looked at her. We started to leave but decided to bury her. We started digging a grave next to the fence, but the ground was too hard, and we quit. We discussed what to do and decided to wrap her in a tent [Sexton] had in the back of his car, weight her and put her in the water. We decided we would do it the next morning. We left, went home and went to bed. Before we went home, we stopped at Sonny Reeser's garage and tried to sell him the car, but he wouldn't buy all of it, just some of the parts.

Thus, we hold that, in light of the overwhelming evidence of the petitioner's guilt of felony murder adduced at his trial, not including Sexton's confession, the admission of that confession was harmless error. See State v. Porterfield, 746 S.W.2d 441, 446 (Tenn. 1988) (under Cruz, admission of the codefendant's confession was harmless error "in light of the overwhelming evidence of guilt, considering only [the defendant's] confession and the evidence of the other witnesses and the circumstances of the murder"). This issue is without merit.

The petitioner also contends that the admission of Sexton's confession was harmful error in the context of the sentencing phase of his trial. We disagree. In reaching its decision on whether to impose the death penalty upon the petitioner, the jury had been charged with a single task: to determine whether the State had proved beyond

14

a reasonable doubt at least one statutory aggravating circumstance and whether the aggravating circumstance(s) was outweighed by "any sufficiently substantial mitigating circumstances." The statutory aggravating circumstances with which the jury was charged are set forth hereinabove. The mitigating circumstances with which the jury was charged were:

> The victim was a participant in the defendant's conduct or consented to the act.
>
> The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.
>
> The youth of the defendant at the time of the crime.
>
> The capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication, which was insufficient to establish a defense to the crime, but which substantially affected his judgment.
>
> Any other mitigating circumstances you may find.

Given the jury's instructions, which it is presumed to follow,[9] the only way in which Sexton's confession could have harmed the petitioner at sentencing is if it supported an aggravating factor not otherwise proved, or if it contradicted the petitioner's proof of mitigation in some manner not otherwise testified to by Sexton himself.

Sexton's confession provided no support for the aggravating circumstance of prior violent felonies. It provided only minimal support for the State's theory that the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind. Sexton's statement contained a single sentence about the petitioner having told him that he had "put her in the trunk of [her car]." However, both Childress' testimony and the petitioner's own statement to the police contained more than sufficient proof of this fact. And while Sexton's statement also included a reference to the victim's having begged for her life, Childress' testimony was much stronger on this point. Accordingly, we find that Sexton's statement did not harm the petitioner by materially bolstering the

---

[9]See, State v. Blackmon, 701 S.W.2d 228, 233 (Tenn. Crim. App. 1985).

15

State's proof of these two aggravating factors.[10]

As previously noted, Sexton's statement included the sentence, "Terry said he wasn't going to let her go, because he was afraid he would get in the same mess he got into with Lori." Certainly, this portion of Sexton's statement provided some proof that the petitioner had committed the murder for the purpose of avoiding or preventing his arrest or prosecution. However, Childress' testimony also included similar proof: that the petitioner had told him that the victim had threatened to "holler rape" and that he "got scared and he couldn't -- he had been in jail before, and he wasn't going back to jail." Moreover, the petitioner's own statement to the police included the admission that, after the victim had raised the specter of a rape accusation, he "at that time . . . knew what she was going to do, and [he] knew what [he] was going to do." In light of this evidence, we hold the admission of Sexton's statement on the issue of this aggravating circumstance to have been harmless.

As to the felony murder aggravator, we have previously held that the death sentence would have been imposed even had the jury given no weight to this factor. Therefore, any support given this circumstance, if any, by Sexton's confession was harmless.

As to the mitigating circumstances offered by the petitioner, Sexton's confession became basically irrelevant in light of Sexton's testimony at the sentencing hearing. We agree with the petitioner that Sexton's testimony may have undercut certain of his mitigation proof. To the extent Sexton's confession contained similar information, then, it became merely redundant. Sexton's confession did not contain any additional or

---

[10]Sexton's confession also included a single reference to the petitioner having choked the victim prior to imprisoning her in the trunk of her car. In light of the other proof supporting this factor, we find that this single reference -- not mentioned by the State during its closing arguments at sentencing -- was insignificant as to this factor.

different information which was independently damaging to the petitioner's proof in mitigation. Accordingly, we hold that the admission of Sexton's confession was harmless error, if error at all, as to the sentencing phase of the trial. The petitioner's contentions with respect to alleged Bruton/Cruz errors are without merit.

The petitioner also complains that his due process rights were violated during the penalty phase of the trial by the trial court's refusal to sever the defendants. We first note that the petitioner has cited no cases finding a due process violation resulting from a joint sentencing hearing. We acknowledge, however, that such violations are theoretically possible where the failure to sever renders the proceeding fundamentally unfair so as to violate due process. See, e.g., Ruiz v. Norris, 868 F.Supp. 1471, 1486 (E.D.Ark. 1994). The petitioner contends that the joint trial rendered the sentencing phase fundamentally unfair because Sexton presented as mitigation that he had participated as a minor accomplice in the murder committed by the petitioner, and that he had acted under extreme duress or the substantial domination of the petitioner.

It was undisputed at both phases of the trial that the petitioner had actually killed the victim. It was also undisputed that the murder had been accomplished with Sexton's gun. The only significant difference in proof at sentencing with respect to Sexton's participation in the murder was whose idea it was to kill the victim. Sexton claimed it was the petitioner's; the petitioner claimed that it was Sexton's. Sexton's testimony on this point was unequivocal. The petitioner's was far less definite. More damning than anything Sexton stated, however, was first, the petitioner's own confession that, as soon as the victim had asked why they had raped her, he "knew what she was going to do, and [he] knew what [he] was going to do." Second, the petitioner admitted during cross-examination that he had "probably" killed the victim because she had mentioned rape and he became scared. Sexton's proof in mitigation of his own guilt paled in comparison with these admissions by the petitioner and we therefore find that

17

Sexton's testimony on this issue did not render the petitioner's sentencing hearing fundamentally unfair.

Nor was the hearing rendered fundamentally unfair by Sexton's testimony that the petitioner had appeared sober[11] to him at the time the petitioner came and got him immediately prior to the murder. The petitioner testified about the quantity of drugs and alcohol which he had consumed prior to the murder, and Sexton did not dispute this testimony. The petitioner offered expert proof as to the likely effects of these substances upon him and Sexton did nothing to contest that testimony. In fact, Sexton admitted that, when he had first seen the petitioner at about 2:00 a.m. on the morning in question, he had appeared to be under the influence of something. While Sexton's testimony about the petitioner's demeanor at the time of the murder was prejudicial insofar as it undercut the petitioner's attempt to offer as mitigation that his capacity to appreciate the wrongfulness of his conduct was substantially impaired as a result of intoxication, we do not think it was so harmful as to render the sentencing hearing fundamentally unfair. The jury undoubtedly understood that each of these men was trying to save himself at the expense of the other, and evaluated their credibility accordingly.

We have further examined the record of the sentencing hearing with respect to the petitioner's allegations of "the extreme antagonism of [Sexton's] counsel" and that Sexton's counsel "hurt [the petitioner] in ways that would have been improper for the State prosecutor to try." Our examination reveals no due process violation. The trial court's refusal to sever the defendants did not render the sentencing hearing fundamentally unfair as to the petitioner. This issue is without merit.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

---

[11]Specifically, Sexton testified that, when the petitioner came and got him at 5:30 or 6:00 a.m. on the morning of the murder, he was "coherent," "not high," and "normal."

18

The petitioner claims that he received ineffective assistance of counsel at both the trial and appellate levels. In reviewing the petitioner's Sixth Amendment claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To prevail on a claim of ineffective counsel, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness" and that this performance prejudiced the defense. There must be a reasonable probability that but for counsel's error the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 687-88, 692, 694 (1984); Best v. State, 708 S.W.2d 421, 422 (Tenn. Crim. App. 1985).

In support of his claim, the petitioner first complains that his trial counsel "abandoned" the defense theory of voluntary intoxication after having introduced it during opening statement. During the guilt phase of the trial, proof of the petitioner's consumption of alcohol and drugs came in through Childress' testimony and the petitioner's confession.[12] Defense counsel did not call Don King, with whom the petitioner and the victim had spent the afternoon and evening, until the sentencing phase. King then testified that, beginning in the morning of July 31, 1984, the petitioner had drunk over a case of beer and had taken two "hits" of acid with the victim. He further testified that the petitioner had been "messed up worse than what I'd ever seen him." Also called by defense counsel during the penalty phase was Dr. Robert Booher, a physician who specialized in addictionology. Dr. Booher testified that LSD "greatly impairs a person's judgment" and that its "behavioral effects can last, usually, around eight to twelve hours." He also testified that Quaaludes cause "a marked impairment in judgment" and that it takes up to twenty-four to thirty-six hours for them to be eliminated from the body.

---

[12]Included in the petitioner's confession were the statements, "I think me and the girl did two hits of acid and a couple of [Quaa]ludes. . . . I was pretty messed up."

19

According to Dr. Booher, alcohol also "impairs a person's judgment" and when alcohol and Quaaludes are combined, "the effects of each more than double each other." He further testified that Quaaludes will inhibit the body's ability to eliminate alcohol. On cross-examination, Dr. Booher testified that he had never examined the petitioner, that he had no way of knowing the amounts of LSD and/or Quaaludes the petitioner had taken without testing the actual substances which he had ingested, and that a person who takes these drugs over a long period of time develops a tolerance to their effects. The petitioner contends that defense counsel erred by not putting on this proof during the guilt phase of the trial so as to require the trial court to give an instruction on voluntary intoxication.

The trial court refused defense counsel's request for an instruction on voluntary intoxication on the basis of Harrell v. State, 593 S.W.2d 664 (Tenn. Crim. App. 1979).[13] In Harrell, this Court stated,

> Proof of intoxication alone is not a defense to a charge of committing a specific intent crime [such as premeditated murder] nor does it entitle an accused to jury instructions. . . ; there must be evidence that the intoxication deprived the accused of the mental capacity to form specific intent. . . . The determinative question is not whether the accused was intoxicated, but what was his mental capacity.

593 S.W.2d at 672. Of course, in the instant case, the only witnesses who could have testified about the petitioner's state of mind at the time he committed the murder were the petitioner himself, Sexton, and the victim. While King's testimony might have been helpful as to the amount of drugs and alcohol he observed the petitioner ingest during the day and evening of July 31, 1984, the murder was not committed until after daylight had begun on the next morning. Don King's testimony, even combined with Dr. Booher's, was simply not sufficient in and of itself to establish the petitioner's state of mind as of the time he murdered the victim. And the petitioner's own statement to the police contains

---

[13]The trial court also cited two later cases, State v. Vanzant, 659 S.W.2d 816 (Tenn. Crim. App. 1983), and State v. Troutt (unpublished). In the trial court's words, these later cases "reaffirm[ed]" and "reiterat[ed]" the holding of Harrell.

20

evidence that his state of mind was not so intoxicated as to require the jury instruction. His confession includes a very detailed recounting of the murder and the events leading up to it, indicating a clear memory; it indicates that he formed an intent to keep the victim from accusing him of rape; that he was able to drive a vehicle and load, point and fire a gun, indicating some level of motor skills; and that he had the presence of mind to go through the victim's personal belongings and burn her pictures and identification after murdering her. The proof available to the petitioner in this case was simply not sufficient to require a jury instruction on voluntary intoxication. Accordingly, defense counsel did not err by failing to pursue this "defense" more vigorously.[14] This issue is without merit.

The petitioner next complains that his trial counsel was ineffective in failing to seek evaluations from mental health experts in a timely fashion. Defense counsel acknowledged on cross-examination that his office had begun the process of locating mental health expertise on January 9, 1985. At this time, the trial was set to begin on January 21, 1985, but was subsequently postponed to January 23, 1985, due to weather. Defense counsel obtained the services of Dr. Martin Gebrow, a psychiatrist, as of January 15, 1985. Dr. Gebrow first examined the petitioner on January 23, 1985: the day the trial began. Dr. Gebrow's evaluation was such that defense counsel made a strategic decision not to call him as a witness. This decision was based on two things: first, that the petitioner had lied to Dr. Gebrow about the circumstances of the murder he committed, and second, that Dr. Gebrow had told defense counsel that the petitioner "was a person that just liked to hurt people."

Defense counsel admitted at the post-conviction hearing that, given the time frame, they were not able to seek a second opinion which may have been more helpful. The petitioner therefore makes much of the delay in seeking Dr. Gebrow's assistance.

_____

[14]While defense counsel may have erred in raising the possibility of this defense during opening statement, the petitioner has failed to prove that this tactic probably affected the jury's verdict.

21

However, the petitioner has failed to prove that, had counsel begun the mental health evaluations earlier, a more favorable evaluation would have been obtained. Although the petitioner offered at the hearing the testimony of Dr. Pamela Auble, who evaluated the petitioner for the purposes of this proceeding, Dr. Auble's testimony does not establish that an earlier pretrial evaluation of the petitioner would have been to his benefit. For one thing, her evaluation of the petitioner occurred many years after the offenses and after many years of incarceration.[15] Also, the petitioner was apparently more truthful with Dr. Auble than he was with Dr. Gebrow. Of course, this "honesty" occurred only after the petitioner had been convicted. Accordingly, to the extent that Dr. Auble's evaluation of the petitioner might have presented a more favorable picture of him, it is impossible for us to conclude whether this more favorable picture stems from the petitioner's varying degrees of veracity in speaking with these experts, the passage of time spent in prison, and/or the fact that one evaluation occurred before conviction, the other years afterward. Thus, it would be sheer speculation for us to conclude that defense counsel would have eventually obtained a more helpful expert opinion had they started the process months earlier. It is the petitioner's burden to prove that he was prejudiced by the alleged failures of his trial counsel, and he has failed to meet that burden on this issue. Accordingly, we find it to be without merit.

The petitioner further complains that defense counsel's delay in seeking mental health expertise resulted in less mitigation proof than should have been offered. The record belies this assertion. Proof of mitigation introduced at trial included the devastating loss of the petitioner's father at an early age, his frequent sniffing of gasoline fumes and use of alcohol and/or drugs beginning at an early age, his poor school and work performances, and the disastrous effects of drugs and alcohol on his thoughts and actions. Also introduced was evidence of the petitioner's remorse and his good behavior while jailed. Dr. Auble's testimony at the post-conviction hearing did not alter this portrait

[15]Dr. Auble testified that she and her associates had evaluated the petitioner in October 1991.

22

of the petitioner in a beneficial manner.[16]  She characterized the petitioner as "impulsive,"

"dependent, immature" and as someone who "took offense very easily" while drinking or

under the influence of drugs  and who "tends to misinterpret people's actions as hostile."[17]

She further testified that the victim's suggestion to the petitioner that she might file a rape

charge

> was a trigger for [the petitioner].  The reasons that it was a trigger --
> there are three reasons.  One is that [the petitioner] has a lot of fears
> of rejection that began way back after his father died.  She was
> rejecting him. He perceived this.  Second, he has this old accusation
> of holding his sister-in-law down while she was being raped.  He
> knows that it is possible that, if a woman does this -- files a rape
> charge -- that it will be very difficult for him, and he will spend time
> incarcerated.
>
> Third, he has had this recent bad relationship with Lori -- recent in
> terms of the time of this event.  He does not expect women to be
> good to him.  He expects them to accuse him of things.  He expects
> to be rejected by them.
>
> These three factors went together and triggered a great deal of anger
> in [the petitioner].  This is anger that he has had for many years.
> Ever since his father died probably is when it started.   This
> overwhelmed him, and he could not cope effectively.  You know, as
> we have talked about , [the petitioner] is impulsive.  He has poor
> judgment and has difficulty handling, or planning, or dealing with
> stress.

Not only does this testimony not add anything beneficial to what was put into evidence

during the sentencing phase, it supports the State's case on the aggravating factor for

committing the offense to avoid prosecution.  Accordingly, the petitioner has failed to

---

[16]Of those portions of Dr. Auble's testimony stressed in the petitioner's briefs as "valuable mitigation evidence," we find only two statements which might have benefitted the petitioner at his sentencing hearing and which were not otherwise indicated by the proof: that the petitioner is "easily led, if he is under stress," and that he "perceived himself as getting advice" from Sexton about what to do. We find that this evidence, even if it had been introduced at trial, would not have helped the petitioner. As discussed more fully above, the petitioner's claims at the sentencing hearing that the murder was Sexton's idea were rendered virtually meaningless in light of his confession and his admission during cross-examination.

[17]We question whether a jury would be less inclined to impose the death penalty on an individual who has been convicted of repeated violent acts, including two murders, and that "tends to misinterpret people's actions as hostile."  One obvious conclusion to be drawn from this psychological insight is that, given the opportunity, the individual may again misinterpret innocent actions as hostile and respond with violence. It is within the realm of every juror's experience and common sense that prisoners -- even those imprisoned for life -- may get such later opportunities, either  through parole (since the sentence of life without parole was not available at the time the petitioner was sentenced) or through escape.

demonstrate that he was prejudiced by his lawyer's failure to hire an expert like Dr. Auble at an earlier time.

The petitioner also complains that his trial counsel was deficient in failing to investigate thoroughly the victim's past. Specifically, he asserts that counsel should have discovered certain public records concerning a prior rape allegation, later dismissed, apparently made by the victim against another man long before she met the petitioner. Defense counsel admitted that he had not discovered this item from the victim's past. However, we fail to see what good this information would have done the petitioner at trial, even had his lawyer stumbled across it. The victim's character was not a relevant issue at trial. The victim's past actions, of which the petitioner had no knowledge at the time he murdered her, were not a relevant issue at trial. Therefore, this "evidence" would not have been admissible at trial and the petitioner suffered no prejudice from his attorney's failure to discover it.

The petitioner next points to his defense counsel's failure to preserve on the record all of the bench conferences which occurred during the trial. While we agree with the petitioner that all bench conferences should be preserved on the record, see, e.g., State v. Hammons, 737 S.W.2d 549, 551 (Tenn. Crim. App. 1987), we disagree that "the lack of a transcript of these crucial conversations" is, ipso facto, prejudicial within the context of Strickland. In order to demonstrate prejudice on this issue, the petitioner must show at least a likelihood that one or more of the unrecorded bench conferences resulted in an adverse ruling that constituted reversible error. The petitioner has not done so. Indeed, the petitioner has conceded that "this factor taken by itself would not warrant reversal." This allegation is without merit.

The petitioner further complains about defense counsel's failure to call him to the witness stand during the suppression hearing. In response to being asked why he

24

did not call the petitioner to the stand, defense counsel testified:

> One, I knew Judge Jenkins wasn't going to believe a convicted felon with his record over the testimony of, at least, two officers. But what deterred us from putting [the petitioner] on the stand was you,[18] and Mr. Crabtree, and . . . Judge Jenkins -- that we did not want to expose [the petitioner] to your cross-examination. We were confident that you would exceed the scope of a suppression hearing in your cross-examination; that Judge Jenkins would allow you to do so, coupled with the fact that we were dealing with a young man that we knew was of below-average intelligence, and would not do well on cross-examination. And we were confident that, upon trial, even though it is not admissible, that some of that stuff that you would glean from a suppression hearing . . . would come in at trial, and we didn't want you to go to school on [the petitioner] as a witness. We wanted your first crack at him to be your only crack at him.

As correctly noted by the court below, this was a "tactical decision" and one that was made with "adequate reasons." We will not now second-guess this strategy call with the benefit of twenty-twenty hindsight. See Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994) ("The petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings.") This issue is without merit.

In his next allegation of ineffective assistance of counsel, the petitioner points to the penalty phase of his trial during which his counsel did not object upon introduction into evidence of a suicide note written by the petitioner's codefendant, Randall Joe Sexton. Sexton had written the note in contemplation of his suicide prior to trial. He testified that he had discussed the contents of the note with the petitioner prior to writing it, and that the petitioner had suggested he include a statement that he, Sexton, was responsible for the victim's death, not the petitioner. The note was found after Sexton attempted suicide and was taken to the hospital, and was used very effectively by the State to impeach Sexton's credibility. The petitioner's counsel subsequently relied on it in closing not only to argue that Sexton could not be believed, but to demonstrate

---

[18]The defense attorney was responding to a question by Mr. Bob Jolley, one of the assistant district attorneys who prosecuted this case at trial.

25

that the petitioner had not tried to rely on this note for his defense, and admitted (during the penalty phase of the trial) to having killed the victim. In other words, defense counsel used it against Sexton and as a method of bolstering their own client's credibility and willingness to take responsibility for his own actions. This was a strategy call by defense counsel and one that we will not condemn.

The petitioner further alleges that defense counsel was ineffective for failing to appeal the State's use during the penalty phase of the trial of a charge that had been made against the petitioner while a juvenile and later dismissed. We remind the petitioner that

> there is no constitutional requirement that an attorney argue every issue on appeal. . . . Generally, the determination of which issues to present on appeal is a matter which addresses itself to the professional judgment and sound discretion of appellate counsel.
> . . .
> Moreover, the determination of which issues to raise on appeal can be characterized as tactical or strategical choices, which . . . should not be 'second guessed' on appeal, subject, of course, to the requisite professional standards.

Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993). When questioned in this case about how he had decided which issues to raise in the direct appeal, defense counsel testified, "You look at the proof as it was adduced at trial. You read your record as carefully as you can, bone up on the applicable case law as to the issues suggested; and the dogs that will hunt, you put in the brief, and the ones that won't, you leave home." Obviously, defense counsel decided that the admission of the juvenile charge in question "wouldn't hunt." We will not second-guess this strategy call.[19]

The petitioner also alleges that one of his trial lawyer's representation was deficient because he failed to timely file a petition for writ of certiorari with the United States Supreme Court after having told the petitioner that he would do so. The State

_____

[19]Also, as set forth earlier in this opinion, we agree that this issue "wouldn't hunt" insofar as it would not have changed our Supreme Court's ruling on the issue of the admission of juvenile offenses.

concedes that the attorney's failure in this regard was "an instance of deficient performance." Whether deficient or not, a lawyer's failure to file a petition for discretionary review does not constitute ineffective assistance of counsel. The United States Supreme Court has held that criminal defendants do not have a constitutional right to counsel to pursue applications for its review. Ross v. Moffitt, 417 U.S. 600 (1974). It has further held that, because a defendant has no constitutional right to counsel to pursue applications for certiorari, he can't be deprived of the effective assistance of counsel by his counsel's failure to file the application timely. Wainwright v. Torna, 455 U.S. 586 (1982). Accordingly, this allegation of ineffective assistance is without merit.

## IV. and V. JURY INSTRUCTIONS

The petitioner next contends that his constitutional rights were violated when the trial court refused to issue jury instructions on second-degree murder and voluntary intoxication. We first note that the trial court's refusal to give an instruction on second degree murder was raised in the direct appeal of this case and overruled. King, 718 S.W.2d at 245. This issue has therefore been previously determined and we need not reconsider it here. T.C.A. § 40-30-112(a). As to the trial court's refusal to give an instruction on voluntary intoxication, this was a matter appropriate to the direct appeal of the petitioner's case. His failure to raise it there constitutes a waiver of this issue. T.C.A. § 40-30-112(b). See House v. State, 911 S.W.2d 705, 714 (Tenn. 1995). Moreover, as noted above, an instruction on voluntary intoxication was not warranted in this case. This issue is without merit.

The petitioner next asserts that the trial court's jury instruction on reasonable doubt violated his due process rights. Specifically, he contests the trial court's description of "reasonable doubt" as meaning "an inability . . . to let the mind rest

27

easily as to the certainty of guilt" and that it requires proof "to a moral certainty."[20]  This

issue was not raised in the petitioner's motion for new trial or on direct appeal.

Accordingly, it has been waived.  T.C.A. § 40-30-112(b).  Additionally, similar instructions

have repeatedly been held to pass constitutional muster.  See, e.g. State v. Nichols, 877

S.W.2d 722, 734 (Tenn. 1994); Pettyjohn v. State, 885 S.W.2d 364, 365-66 (Tenn. Crim.

App.); State v. Hallock, 875 S.W.2d 285, 294 (Tenn. Crim. App. 1993).  See also State

v. Michael Dean Bush, No. 03C01-9403-CR-00094, Cumberland County (Tenn. Crim.

App. filed Feb. 12, 1996, at Knoxville).  This issue is without merit.


## VI.  PROSECUTORIAL MISCONDUCT

The petitioner also claims that his due process rights were violated by the

prosecution's "offering inadmissible, irrelevant and inflammatory evidence" during both

the guilt and penalty phases of his trial.  Of course, issues concerning the admissibility

of evidence, prosecutorial misconduct and the necessity of a mistrial, must all be

addressed on direct appeal or they are waived.  T.C.A. § 40-30-112(b).  And, to the

extent that the petitioner's concerns about the presentation of evidence and prosecutorial

argument were reviewed on direct appeal, they have been previously determined and

need not be re-examined by this Court.  T.C.A. § 40-30-112(a).  Accordingly, this issue

is without merit in this proceeding.


## VII.  CUMULATIVE ERROR

In his last issue, the petitioner contends that he is entitled to a new trial

and/or a new sentencing hearing based upon the cumulative errors which occurred during

---

[20]The reasonable doubt instruction given during the guilt phase was "Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of guilt.  Reasonable doubt does not mean a captious, possible, or imaginary doubt.  In order to convict a defendant of any criminal charge, every element of proof required to constitute the offense must be proven to a moral certainty, but absolute certainty of guilt is not demanded by the law."  At the penalty phase, it was "Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of your findings.  You are the sole and exclusive judges of the credibility of the witnesses and the weight to be given to the evidence presented."

his trial. A review of our Supreme Court's decision in the direct appeal of the petitioner's convictions and sentence reveals that it found only three errors to have been committed during the trial: the admission of Lori Eastman Carter's testimony; the State's cross-examination of the petitioner concerning his juvenile offenses; and the trial court's failure to define the word "torture" in its instruction to the jury on the "heinous, atrocious or cruel" aggravating circumstance. It further found each of these errors to have been harmless. In our review of the alleged errors which are properly before us in this post-conviction proceeding, we have determined that the admission of Sexton's confession and the use of the felony murder aggravator <u>may</u> have been error, but were also harmless. Even when viewed cumulatively, we do not find that the sum total of these errors robbed the petitioner of a fair trial at either the guilt or penalty phases. This issue is without merit.

Having found no reversible error in the lower court's ruling on this petition for post-conviction relief, we affirm the judgment below. The sentence of death will be carried out as provided by law on the 22nd day of September, 1997, unless otherwise ordered by this Court, or other proper authorities.


_____
JOHN H. PEAY, Judge


CONCUR:


_____
PAUL G. SUMMERS, Judge


_____
CORNELIA A. CLARK, Special Judge