IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 26, 2014

## JOHNNY COFFEY v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Bradley County**
**No. 12-CR-503    Carroll L. Ross, Judge**

---

**No. E2013-01659-CCA-R3-PC - Filed April 23, 2014**

---

The Petitioner, Johnny Coffey, appeals the Bradley County Criminal Court's denial of post-conviction relief.  The Petitioner was convicted of second degree murder and sentenced to twenty years' imprisonment.  On appeal, he argues that trial counsel was ineffective by failing to properly petition the trial court for a State-funded psychiatric expert to assist the defense.  Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JEFFREY S. BIVINS and ROGER A. PAGE, JJ., joined.

C. Richard Hughes, Jr., District Public Defender, Cleveland, Tennessee, for the Petitioner-Appellant, Johnny Coffey.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Steven Bebb, District Attorney General; and Cynthia Lecroy-Schemel, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

This appeal stems from the stabbing death of the victim, Jesse Schoate, on September 27, 2008.  The Petitioner was indicted by the Bradley County Grand Jury for one count of first degree murder.  In its opinion on direct appeal, this court summarized the pertinent evidence presented at trial:

> Cassie Brown, Mr. [William] Burrell's girlfriend at the time of the murder, helped Mr. Burrell plan Ms. [Misty] Thompson's party.  While helping Mr. Burrell set up for the party, Ms. Brown realized they needed some

items, so she went to the store. When she returned, the [Petitioner] was there, which she thought odd because the [Petitioner] had not been invited to the party. Later that evening, she and the [Petitioner] were sitting around the campfire drinking beer when they saw "headlights coming over the hill" toward the party. The [Petitioner] told Ms. Brown "that he didn't know who it was, but he was gonna go get a shotgun out of his truck." She said she told him to "shut up." The [Petitioner] remained beside the fire.

When the band finished playing at midnight, people began to leave, and Ms. Brown "climbed into the van and went to sleep." At approximately 2:00 a.m., "[t]here was a lot of screaming and banging on the van door." When she opened the van door, Ms. Brown saw the victim "laying on the ground" and the [Petitioner] "on the other side of" the fire "with a knife in his hand, just covered in blood." Ms. Brown testified that she "[a]utomatically" wrapped the victim in a blanket and began cardiopulmonary resuscitation ("CPR"). She said that the victim "had a large gash underneath his left arm," and Ms. [Autumn] Cooper and the [Petitioner] were trying to get the victim into the van. Then she saw the [Petitioner] pull the victim's feet so that they could not actually get the victim into the van. She said that she never saw the [Petitioner] attempt to render aid to the victim.

Autumn Cooper testified that she and the victim, who were dating at the time, attended Ms. Thompson's birthday party together. She met the [Petitioner] for the first time when she arrived for the party and saw him with Mr. Burrell. Ms. Cooper said that later that evening, she saw the [Petitioner] with his hands inside Ms. Thompson's tent "feeling around on her legs." When Ms. Cooper asked the [Petitioner] what he was doing, he said, "She's unconscious. . . . she's dying." Ms. Cooper ordered the [Petitioner] out of the tent and got into the tent with Ms. Thompson. She recalled that she stayed for 15 to 20 minutes talking with Ms. Thompson until Ms. Thompson fell asleep. After she left Ms. Thompson's tent, Ms. Cooper got some snacks for herself and the victim [and] [s]he returned to the tent the couple was sharing[.]

Ms. Cooper said that she and the victim ate for a few minutes and "pick[ed] at" one another before deciding to go to sleep. The victim went outside to urinate. Ms. Cooper said that she could hear the victim urinating and that she heard the [Petitioner] say, "You know you like it." The victim said, "I don't know what you're talking about, man," and the [Petitioner] said, "Why don't you come down to the campfire with me?" Ms. Cooper testified that the victim refused and told the [Petitioner] to "go to bed and leave [them]

-2-

alone" before zipping the tent. She recalled that the [Petitioner] then unzipped the tent, and the victim again told the [Petitioner] to leave and zipped the tent. At that point, the [Petitioner] stepped down onto the tent and onto Ms. Cooper's chest. She said that she and the victim tried to be quiet because they were unsure what the [Petitioner] might do next.

The [Petitioner] then began kicking and pulling the tent to the ground with Ms. Cooper and the victim inside. She said that they immediately began groping for the zipper. The victim found the zipper and started crawling out, with Ms. Cooper close behind him. Ms. Cooper said that when she emerged from the tent she saw the [Petitioner] and the victim on the ground. She testified that Mr. Burrell attempted to separate the men. Suddenly, the [Petitioner] looked at Ms. Cooper and said, "He's bleeding, he's bleeding." The [Petitioner] pulled the victim to his feet, and Ms. Cooper saw that he had been stabbed. Ms. Cooper said that she immediately began looking for her car keys so that she could take the victim to the hospital. She explained that cellular telephones would not work in the remote area. When she could not find her own keys, she decided to try to get the victim to the van where Ms. Brown was sleeping. The [Petitioner] helped her carry him.

During cross-examination, Ms. Cooper admitted that she told officers that the victim "went after" the [Petitioner] when he emerged from the tent, but she explained that the victim "didn't even have time to stand up" before the [Petitioner] attacked him.

Bradley County Sheriff's Office ("BCSO") Officer James Bohannon testified that he responded to a 1:30 a.m. call of a stabbing at a location on Bradford Lane in Charleston. When he arrived, he encountered Mr. Burrell, who was bleeding from a cut on his hand and urging the officer to go to the victim in a nearby field. On his way, Officer Bohannon encountered the [Petitioner] "walking through the field" toward the scene and "covered in blood." The [Petitioner] did not speak to the officer but "pointed down the field to the direction of a white van" where another individual was performing CPR on the victim. Officer Bohannon took over CPR. As he performed CPR, the [Petitioner] walked up and sat down on the ground behind the officer and the victim. The [Petitioner] said "that he didn't mean to cut [the victim] so deep." At that point, Officer Bohannon briefly stopped CPR to handcuff the [Petitioner].

The shirtless [Petitioner] had blood on his face, shoulders, and hair. When other officers arrived, the [Petitioner] told them that the murder weapon was in his pocket. Officer Bohannon took a small knife and a large knife from the [Petitioner]. The larger of the two weapons was covered in blood. He never saw the [Petitioner] attempt to aid the victim.

United States Secret Service Special Agent Joseph Lea testified that at the time of the murder he was working as a Detective with BCSO and that he acted as the primary investigator in the case. Detective Lea said that when he arrived on the scene, he observed the victim on the ground next to a white van. He recalled that a tent identified as belonging to the victim had been knocked to the ground, and witnesses said that the [Petitioner] had knocked it down. A trail of blood led from the tent to the victim's body. Detective Lea described the victim's injuries,

> He had a laceration about that long on his abdomen, another one long across his chest, another one that went the whole radius of his arm, and . . . another cut to his back around the same area, and I believe his ear was also cut, the top part of his ear.

Detective Lea testified that toxicology testing showed that the victim's blood was negative for the presence of narcotics and that his blood alcohol level was .18 percent. Testing also established that the [Petitioner]'s blood alcohol level was .10 percent and that his blood tested positive for the presence of propoxyphene, norpropoxyphene, dihydrocodeinone, and alprazolam. Forensic testing also established that the victim's blood was on the large knife confiscated from the [Petitioner].

During cross-examination, Detective Lea conceded that the level of drugs in the [Petitioner]'s system were within therapeutic limits. He also acknowledged that the location of the [Petitioner]'s shirt at the crime scene was consistent with witness accounts that the [Petitioner] had attempted to use his shirt to stem the victim's bleeding. Finally, he acknowledged that Mr. Burrell told police that the [Petitioner] and the victim ran toward one another at the beginning of the altercation.

. . . .

The [Petitioner] offered the testimony of William Burrell. Mr. Burrell testified that he knew the [Petitioner] but "wouldn't call him a friend."

-4-

Nevertheless, he invited the [Petitioner] to Ms. Thompson's party. He said that the [Petitioner] "kept causing problems" throughout the evening culminating in the victim's murder. He recalled that in the minutes leading up to the stabbing, he heard the victim's "begging [the Petitioner] to leave him alone" and the [Petitioner]'s telling the victim to come to the campfire. He also saw the [Petitioner] "stomping and kicking" at the victim's tent as the victim tried to get out of it. Mr. Burrell said that he ran toward the [Petitioner] just before the victim exited the tent. He said that "no sooner than [the victim] came out of the tent, it was like [the victim and the Petitioner] fell straight down." He stated that he could not really tell what was happening, but he admitted that he told Detective Lea that it appeared that the victim "was beating Johnny up." He said that he tried to break up the fight, and the [Petitioner] "whacked off" his finger with a knife.

Doctor June Young, a Clinical Psychologist, testified that she evaluated the [Petitioner] and concluded "that he was competent to stand trial[ ] and that there was no support for insanity." She agreed that the [Petitioner] had been treated by a psychiatrist for "many years" and that he had had "[q]uite a few" mental hospitalizations. She said that she reviewed the records of the [Petitioner]'s treating psychiatrist, Doctor Troy Gilson, and agreed that the [Petitioner] had been diagnosed with bipolar disorder. She did not review records of the [Petitioner]'s hospitalization at Moccasin Bend for mental health issues, explaining that the hospitalization "was too far away from the time of the alleged crime to be relevant." Doctor Young explained that she only reviewed the [Petitioner]'s records going back to 2007 because her "job was to determine his mental condition around the time of the crime, not for the past 15 years." She did review the records of his most recent admission to Peninsula Hospital. In addition to her review of the relevant records, Doctor Young met with the [Petitioner] for approximately 90 minutes. She agreed that the [Petitioner] continued to be affected by mental illness but concluded that the [Petitioner]'s mental illness did not render him legally incompetent or insane. She emphasized, "My report does not say that he is not affected by mental illness. It simply states that his mental illness was not so severe as to interfere with his ability to appreciate the wrongfulness of his acts."

Doctor Young acknowledged that she did not speak directly with Doctor Gilson, explaining that she wanted to avoid a conflict of interest.

Renee Kimsey, who had previously maintained a romantic relationship with the [Petitioner], testified that the [Petitioner] had "an unnatural fear" that

he was being watched and that, on occasion, he "would talk to people that [she] didn't see." She recalled one specific occasion when she observed the [Petitioner] talking to "a teenage boy and a teenage girl" that were not really there. She said that the [Petitioner] had had several surgeries on his neck and his knees and that "[h]e's very protective of the areas that have been . . . injured prior." Specifically, she stated that the [Petitioner] was "very fearful that if someone hit him or injured him that he could become paralyzed or even that it would kill him." During the weeks just prior to the offense, the [Petitioner] called her and told her that he was "chasing [her] through the woods" when she was not even in the same county.

. . . .

The 41-year-old [Petitioner] testified that Mr. Burrell invited him to Ms. Thompson's birthday party and asked him to act as "a bouncer" because the [Petitioner] had both a handgun and a handgun carry permit. The [Petitioner] said that he told Mr. Burrell that he "wasn't able to be no bouncer, but [he would] show up." The [Petitioner] stated that prior surgery on his hands, knees, and neck prevented him from working as a bouncer.

He arrived at the party location at approximately 5:00 p.m. and helped Mr. Burrell set up for the party. The [Petitioner] said that he could not "remember much" of the struggle with the victim, explaining, "[I]t seems like . . . he come running at me or something, and I throwed (sic) my hand up and said, 'Stop, wait,' or something to that effect. I mean, I can't really remember." He testified that the next thing he remembered was the victim's lying "there on the ground and he's cut, and I took my shirt off and put it on his side." The [Petitioner] claimed that he was frightened and confused at the time. The [Petitioner] insisted that he did not intend to kill the victim[.] He could not recall kicking the victim's tent prior to the homicide.

The [Petitioner] testified that in addition to his medical issues, he had been treated by Doctor Gilson for mental health issues for several years and had been hospitalized for those issues "a lot[.]" . . . The [Petitioner] said that he often suffered from panic attacks. He conceded that he consumed alcohol "every once in a while" even though doctors told him that he should not do so while on medication.

State v. Johnny Coffey, No. E2011-00192-CCA-R3-CD, 2012 WL 362969, at *1-7 (Tenn. Crim. App. Feb. 6, 2012), perm. app. denied (Tenn. Apr. 11, 2012).

-6-

Based on the above evidence, the jury convicted the Petitioner of the lesser included offense of second degree murder. He was subsequently sentenced to twenty years' imprisonment. This court affirmed his conviction and sentence on direct appeal. Id. at *1. The issues raised on direct appeal, and rejected by this court, included whether the trial court erred in: (1) denying the Petitioner expert funds for an independent psychological evaluation; (2) prohibiting his treating psychiatrist from testifying about his history of mental illness; (3) ruling that he could not play video recordings of witness statements in their entireties; (4) overruling his motion for mistrial; (5) refusing to provide a jury instruction on self-defense; and (6) failing to apply certain mitigating factors when sentencing him. The Tennessee Supreme Court denied the Petitioner's permission to appeal.

On November 19, 2012, the Petitioner filed a timely pro se petition for post-conviction relief, alleging, inter alia, forty-eight grounds of ineffective assistance of counsel. The Petitioner was subsequently appointed counsel, and an amended petition for post-conviction relief was filed contending that trial counsel was ineffective for: (1) failing to properly petition the trial court for a State-funded independent expert to assist in the Petitioner's claim of diminished capacity or self-defense; and (2) failing to adequately investigate and present evidence at trial of the Petitioner's mental condition and level of intoxication at the time of the offense. The post-conviction hearing took place on April 5, 2013.

**Post-Conviction Hearing.** Trial counsel testified that he and his father, co-counsel, were retained by the Petitioner and his family. He said he was the lead attorney and that co-counsel agreed to assist as needed. On October 12, 2009, trial counsel petitioned the court and received an order for a forensic evaluation to determine the Petitioner's competency to stand trial and his mental condition at the time of the crime. Based on the court order, the Petitioner was evaluated at Hiwassee Mental Health Center by psychologists June Young and Todd Wiggins. Trial counsel stated that he received the report from the evaluators concluding that the Petitioner was competent to stand trial and that the defense of insanity could not be supported.

Trial counsel was dissatisfied with the results and concerned with the thoroughness of the forensic evaluation. Based on his discussions with the Petitioner, trial counsel questioned the amount of time the psychologists spent with the Petitioner and whether they had reviewed his long history of mental illness. Consequently, trial counsel further requested and reviewed the underlying findings from the forensic evaluation. He recalled that the more specific findings stated that the Petitioner appeared to be below average in attention and concentration, abstract reasoning, and judgment. The findings also indicated that the Petitioner was in the low average range in intellectual functioning. Trial counsel was aware that the Petitioner had a history of mental illness and that he had received SSI disability benefits for some time. He was also aware of the Petitioner's educational background,

including the fact that the Petitioner quit school after repeating the eighth grade three times and that he attended special education classes. According to trial counsel, during representation the Petitioner appeared to be low-functioning on some levels and did not always have a realistic perception of his case.

Trial counsel testified that he subpoenaed the records from the Petitioner's prior hospitalizations at Moccasin Bend Mental Health Institute, Pine Ridge Treatment Center, and Peninsula Hospital. He was aware that the Petitioner was admitted to Moccasin Bend in 2000 for consuming moonshine and that those records reflected that the Petitioner's psychiatric illness may be induced by alcohol. On this issue, trial counsel stated:

> From a strategic standpoint in my representation of [the Petitioner], on one hand we thought we might could make a good issue or defense out of the fact that his use of intoxicants could exacerbate his mental problems, but then on the other hand -- and we discussed this with [the Petitioner] -- we knew that there was a potential jury charge out there about voluntary intoxication so we were walking a fine line about how much to raise that issue with the jury at trial.

He considered the voluntary intoxication instruction to be a "bad strategic request" and recalled that the State requested the charge. Trial counsel agreed that the evaluators had concluded in the forensic evaluation of the Petitioner's mental state at the time of the offense:

> His excessive voluntary consumption of alcohol, benzodiazepines, and probable opiates could cause him to act impulsively without regard to possible consequences. His alleged actions are most consistent with habits developed from prior impulsive antisocial conduct rather than with an explanation based on mental illness or defect.

Trial counsel said he was concerned because even though the evaluators acknowledged the Petitioner's mental diseases, they did not use the "magic words" to support his defense.[1]

---

[1] The findings of the evaluators specifically concluded:

These evaluators find no evidence of insanity at the time of the alleged offenses. He was conscious of his actions and appeared to conduct himself in a rational albeit impulsive manner. There is no indication that psychotic processes or pathological motivations were active at the time of the alleged offenses. Although he has some minor intellectual deficits, he is fully able to appreciate the wrongfulness of his alleged actions.

Trial counsel testified that during the course of his investigation, he decided to rely on a theory of self-defense based in part on statements that witnesses made to investigators. He said the victim's girlfriend and Mr. Burrell were very reluctant to acknowledge their prior statements. Trial counsel stated that after extensive cross-examining and several jury-out hearings, Ms. Cooper testified that the victim exited the tent and "went after" the Petitioner, and Mr. Burrell testified that it appeared as though the victim was beating up the Petitioner.

Based on his dissatisfaction with the court-ordered forensic evaluation, trial counsel filed a motion for State funding "to seek out another expert" for an additional evaluation. He testified that the trial court denied the motion with an oral order stating something to the effect of, "We're not going to keep appointing experts until you get one that you are satisfied with."[2] Trial counsel said he was familiar with the procedure under Supreme Court Rule 13 for procuring expert assistance based on a showing of particularized need. He stated that he did not file such a motion in the instant case because he "had already requested an evaluation and been granted one, and then [he was] asking for another one[.]" When asked if he could have made a showing of a particularized need for the Petitioner based on his mental illness and the combined influence of drugs and alcohol at the time of the offense, trial counsel responded:

> [O]n the one hand, it goes back to strategic reasons of do we want to portray that picture and put all that out there to show a particular need, and then the State really hammer us on the voluntary intoxication charge and use that against us if we use that to show a particularized need. And then on the other hand . . . [the trial court] didn't deny my motion for another psychological expert because I didn't show a particularized need. He denied it because he said we weren't gonna use more funding for a second expert.

Trial counsel said he asked the trial court to allow the Petitioner's longtime treating psychiatrist, Dr. Troy Gilson, to testify on behalf of the defense but was denied the request. Thereafter, trial counsel called Dr. June Young to testify as to the Petitioner's mental history. Trial counsel agreed that neither Dr. Gilson nor Dr. Young had conducted an independent examination on the issue of diminished capacity. He said it was stipulated at trial that the Petitioner had a blood alcohol level of .10 percent but there was no expert testimony to explain what the results meant from a medical perspective. He agreed that an expert could have explained how narcotics and alcohol interact to affect a person's central nervous system and conduct.

_____

[2] The parties stipulated for the record, and the post-conviction court agreed, that this statement sounded accurate.

Trial counsel stated that if the self-defense theory was unsuccessful, his strategy was to persuade the jury that the offense was less than second degree murder. He said that throughout his representation, the Petitioner was intent on testifying at trial "to tell his side of the story[.]" Trial counsel agreed that the jury did not find the Petitioner's testimony particularly convincing and that the Petitioner was much more specific in his statement in the presentence report. Trial counsel estimated that at the time of trial, the Petitioner had been in custody for a month. He did not recall that the Petitioner complained about withdrawing from medications while in custody. He believed the Petitioner had issues concerning his memory of the events.

Trial counsel testified that he had a good relationship with the Petitioner during his representation. He said he "spent numerous hours" with the Petitioner and that he had not spent as much time with another client in his entire practice.

On cross-examination, trial counsel stated that there was no particularized need that had developed between the time of the first forensic evaluation and the request for the second evaluation. He said he did not discuss the results of the toxicology and alcohol reports with the analyzing agent from the Tennessee Bureau of Investigation (TBI). He acknowledged that some time had passed between the offense and when the Petitioner's blood was drawn at the hospital.

On redirect examination, trial counsel could not recall how much time had passed between when the Petitioner was arrested at the scene and when his blood was drawn. He testified that he considered filing a Rule 13 ex parte motion for expert assistance but did not see a reason to do so when he had already openly asked the trial court for another expert. Trial counsel agreed that there are experts that could have addressed the issues of diminished capacity and voluntary intoxication. He acknowledged that a critical issue was whether or not the Petitioner was capable of a knowing homicide. He said he consulted with the members of the Petitioner's family about his history of mental illness and his alcohol and drug abuse.

Special Agent Stephanie Dotson, a forensic scientist with the TBI Knoxville Regional Crime Laboratory, testified that she had been employed with the TBI for fifteen years. She described in detail her extensive experience and training in forensic toxicology. She said she was qualified "to interpret the side effects to drugs and alcohol, and in combination what those effects can cause." She clarified that she cannot testify that a certain person was impaired based on her findings but that she could testify as to possible side effects in general. Agent Dotson explained that apart from the toxicology report, additional facts and circumstances are crucial in determining an individual's impairment because one may have built up a tolerance to the substances.

-10-

Agent Dotson performed the analysis of the blood sample from the Petitioner, which revealed the presence of propoxyphene, norpropoxyphene, and dihydrocodeinone. Propoxyphene, known as Darvocet, is a prescription-only pain medication that has since been taken off the market. She explained that propoxyphene breaks down into norpropoxyphene in the body. She said dihydrocodeinone, or hydrocodone, is a prescription-only opiate. Additional testing revealed that there was alprazolam, also known as Xanax, in the Petitioner's blood. Agent Dotson described these medications as central nervous system depressants that can affect judgment and the ability to process information. She said these substances were found to be within or below therapeutic levels.

Agent Dotson was aware that the Petitioner also had a blood alcohol level of .10 percent. She agreed that the blood sample was drawn at 4:21 a.m. on September 27, 2008 and that the evidence indicated that first responders had arrived at the scene at approximately 1:52 a.m. that day. She testified that the lapse of time "can make quite a difference" in blood alcohol level depending on the circumstances. She said the combination of drugs and alcohol can have an "additive effect" on the central nervous system, possibly increasing the side effects and impairment.

On cross-examination, Agent Dotson acknowledged that she did not know the specific circumstances of the Petitioner's ingestion of alcohol and drugs. She did not know the effect the substances could have on the Petitioner because she did not know the amounts he took or when he had consumed them. She agreed that everyone metabolizes drugs and alcohol differently.

On redirect examination, Agent Dotson testified that trial counsel did not contact her on the Petitioner's behalf. She agreed that an expert in her field could be provided with information regarding the circumstances of a person's consumption of alcohol and drugs. On recross-examination, Agent Dotson agreed that the information provided would be subjective. She said she could not testify with medical certainty as to the additive effect of drugs and alcohol on the Petitioner. After further redirect examination, Agent Dotson said she would need information such as when the medications were taken, among other different factors to determine the additive effect. She agreed that behavioral evidence from the individual and from witnesses could be helpful.

The Petitioner testified that he and his family retained the services of trial counsel and co-counsel. He believed co-counsel was supposed to represent him at trial. He did not recall discussing the need for additional money to procure an expert. He recalled signing releases for trial counsel to obtain his mental health records. The Petitioner said he received Social Security benefits since his late twenties or early thirties for his mental disability. He testified that Dr. Troy Gilson had been his treating psychiatrist for several years and that he was

-11-

prescribed different drugs for bipolar disorder, schizophrenia, and panic disorder. He did not believe that he was compliant with his prescribed medication regimen on the night of the offense. He said he drank seven or eight cups of beer before the victim was stabbed.

The Petitioner stated that he completed the seventh grade but that he had to repeat the eighth grade several times. He said he attended special education classes and had difficulties with reading, comprehension, and math. He testified that the forensic evaluator asked him what a judge and jury were, and then she left after fifteen minutes. He stated that trial counsel spent an hour and a half preparing him for his testimony. He said his version of the events in the presentence report significantly differed from his trial testimony because he was withdrawing from Xanax and pain medication at the time of trial. According to the Petitioner, he had been in custody for two or three days prior to trial. He said he was hallucinating during his trial and he "watched water run up out of that floor over there the whole time." He would not have testified if it weren't for the self-defense theory. The Petitioner said he did not talk to trial counsel much about his case and that trial counsel did not interview his family about his mental health history or his substance abuse. He stated that most of their discussions were about selling the Petitioner's house. He believed that trial counsel spent a total of an hour and a half with him in preparation for the trial.

The State called trial counsel as a rebuttal witness after the close of the Petitioner's proof. Trial counsel testified that he and co-counsel prepared the Petitioner for his trial testimony at their office. Co-counsel acted as the prosecutor and cross-examined the Petitioner with difficult questions. Trial counsel said that the Petitioner was cooperative but that he had perceived some of the questions as accusations rather than as part of a helpful exercise. He stated that he spent numerous hours with the Petitioner both in person and on the phone and that they met at various places in Bradley and Polk Counties, including at his law office and at the private investigator's office. Trial counsel said the Petitioner and his family arranged to pay the legal fees through conveyance of the interest in the Petitioner's home. He said this arrangement was made at the beginning of representation and that he did not place the home for sale until after the case was over. Trial counsel testified that he was aware of the toxicology reports and that he and co-counsel had discussed the voluntary intoxication issue at length. He said that, from a strategic standpoint, they believed that addressing the voluntary intoxication issue would be detrimental to the case and would be looked upon unfavorably by the jury. He did not call the TBI agent to testify because she did not have specific knowledge about the Petitioner or his state of mind. Trial counsel did not believe that testimony about the quantity of the substances "would hold much weight."

At the conclusion of the hearing, the post-conviction court took the matter under advisement. On June 13, 2013, the court entered a written order denying relief. The Petitioner filed a timely notice of appeal.

-12-

## ANALYSIS

On appeal, the Petitioner contends that trial counsel provided ineffective assistance of counsel by failing to demonstrate a particularized need for purposes of procuring a State-funded psychiatric expert to assist the defense. In response, the State argues that the post-conviction court properly denied relief because the Petitioner failed to establish that he received ineffective assistance of counsel. We agree with the State.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103. The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation marks and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." Id. (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

Vaughn further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

Vaughn, 202 S.W.3d at 116 (internal quotation marks and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694).

We note that "[i]n evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89. However, this "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

Based on his history of mental illness, his erratic behavior at the time of the offense, and his consumption of various drugs and alcohol, the Petitioner contends that trial counsel could have clearly demonstrated a particularized need for the appointment of an independent expert. Because his mental condition at the time of the alleged offense was a central issue, the Petitioner asserts that an expert could have investigated and consulted with counsel to develop defenses relating to diminished capacity and the additive effect of the various substances in the Petitioner's system. He claims that expert assistance would have lessened the degree of homicide.

In its written order, the post-conviction court specifically held that the Petitioner was not entitled to relief for trial counsel's failure to procure an additional expert evaluation:

The court at trial found that no "particularized need" had been shown that would warrant a state-funded and new evaluation for the petitioner. The court's decision was upheld by the appellate court and cannot now be attacked in a petition for post conviction relief by alleging that trial counsel was ineffective by not obtaining such a second evaluation.

In addition, the court concluded that trial counsel presented adequate evidence of the Petitioner's mental history and level of intoxication at the time of the offense:

[M]uch was made at trial by defense counsel of petitioner's level of intoxication at the time of the homicide and of his bizarre behavior. As the state accurately pointed out in closing argument at the hearing in this cause, the jury could easily have found the defendant guilty of First Degree Murder, and the fact that they returned a verdict of Second Degree Murder shows how effective trial counsel was in presenting these issues to a jury.

After a thorough review of the record, we agree with the post conviction court and conclude that the Petitioner has failed to prove by clear and convincing evidence that he received ineffective assistance of counsel. At the post-conviction hearing, the Petitioner failed to call an expert witness or present any evidence to establish the existence of a mental disease or defect which precluded him from forming the requisite intent to commit a knowing homicide. "'As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.'" Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008) (quoting Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)). Although the Petitioner called TBI Special Agent Dotson to testify as to the results of his toxicology and blood alcohol reports, there is no indication that her testimony would have been favorable, or even relevant, regarding his mental capacity to commit the offense. See Denton v. State, 945 S.W.2d 793, 802-03 (Tenn. Crim. App. 1996) (citing Black, 794 S.W.2d at 757).

Further, it is significant to note that diminished capacity is not a defense to a criminal charge, but rather, a rule of evidence to show that the defendant lacked the requisite mens rea to commit the offense. State v. Adams, 405 S.W.3d 641, 660 (Tenn. 2013); see also State v. Hall, 958 S.W.2d 679, 688-89 (Tenn. 1997). The record shows that trial counsel was aware of the Petitioner's mental health history, substance abuse, and educational background. He reviewed the Petitioner's mental health records and interviewed the Petitioner's family. Dissatisfied with the conclusion of the initial forensic evaluation, trial counsel petitioned the trial court for a second evaluation but was denied the request. Ultimately, trial counsel did present the testimony of Dr. June Young to establish that the Petitioner suffered from various

mental disorders, and the jury acquitted the Petitioner of first degree murder. After perfecting the issue for direct appeal, this court rejected a similar claim and affirmed the Petitioner's second degree murder conviction. While it is clear that the Petitioner has some educational difficulties and a troubled mental history, he has not established that he was incapable of forming the requisite mens rea for second degree murder, deficient performance of counsel, or prejudice at trial.

On the issue of voluntary intoxication, trial counsel testified that it was a strategic decision not to emphasize the Petitioner's consumption of alcohol and prescription medications on the night of the stabbing because he considered this evidence to be "detrimental" to the case. Even if counsel had incorporated voluntary intoxication as desired by the Petitioner, it would not have aided the Petitioner's defense. See State v. McKinney, 603 S.W.2d 755, 760 (Tenn. Crim. App. 1980) ("Second-degree murder is not a specific intent crime, and voluntary intoxication will not mitigate, excuse, or justify this offense.") (citing Harrell v. State, 593 S.W.2d 664 (Tenn. Crim. App. 1979)). Based on the record, we cannot conclude that the verdict in the Petitioner's trial was undermined or that the proceedings were fundamentally unfair because of trial counsel's failure to procure an independent psychiatric expert. See Strickland, 466 U.S. at 670 ("[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged."). Because the Petitioner has not presented any evidence or an expert to establish how a mental disease or defect precluded his ability to commit a knowing murder, he has failed to establish prejudice. Accordingly, the Petitioner has not met his burden of proof and he is not entitled to post-conviction relief.

## CONCLUSION

Upon review, we conclude that the Petitioner has failed to prove by clear and convincing evidence that he received ineffective assistance of counsel. The judgment of the post-conviction court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE